### AFFIDAVIT OF JEREMY D. BRISSON IN SUPPORT OF APPLICATIONS FOR SEARCH WARRANTS FOR APPLE IPHONE 13 PRO MAX AND APPLE IPHONE XR

I, Jeremy D. Brisson, being duly sworn, depose and state as follows:

### INTRODUCTION

1.      I am a Special Agent with the federal Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF").  I have been employed as an ATF Special Agent since 2023.  As an ATF Special Agent, my duties include the investigation of violations of laws related to firearms trafficking, firearm possession by prohibited persons, and the use of firearms in drug trafficking crimes.  I was the distinguished honor graduate of the ATF National Academy and of the Federal Law Enforcement Training Center.  I possess an undergraduate degree in Finance.  I am currently assigned to Group VI in the Boston Field Division of the ATF.  This group works with other federal, state, and local police departments north of the City of Boston to investigate and prosecute violations of the federal firearms, explosives, and controlled substance laws.  Prior to my employment with ATF, I had been in law enforcement in several capacities for approximately thirteen years.  I was employed as a Deputy United States Marshal with the United States Marshal Service, a Federal Air Marshal with the U.S. Department of Homeland Security, and as a municipal law enforcement officer in the state of New Hampshire.

### PURPOSE OF AFFIDAVIT

2.      I submit this affidavit pursuant to Federal Rule of Criminal Procedure 41 in support of applications for warrants to search an Apple iPhone 13 Pro Max, assigned Federal Bureau of Investigation ("FBI") evidence number 1B321 ("Target Telephone 1"), more fully described in Attachment A-1, and an Apple iPhone XR, assigned FBI evidence number 1B330 ("Target Telephone 2"), more fully described in Attachment A-2.  Target Telephone 1 and Target Telephone

2 (collectively, "the Target Telephones") were seized from inside 11 Greendale Avenue, Lowell, Massachusetts on July 27, 2023, and searched pursuant to a search warrant issued by the Honorable Jennifer C. Boal, U.S. Magistrate Judge for the District of Massachusetts, *see* Search Warrant Case 23-MJ-7313-JCB.

3.      Digital copies of a partial file system extraction of Target Telephone 1 and a full file system extraction of Target Telephone 2 are currently preserved and stored in ATF possession in the ATF Boston Group VI evidence vault.  As set forth herein, based upon my review of data from the Target Telephones to date, there is probable cause to search and seize additional data beyond the date range authorized by Search Warrant 23-7313: December 1, 2022, through June 27, 2023.  More specifically, there is probable cause to believe that i.) Samnang Son ("SON") was the user of Target Telephone 1, ii.) Billy Chan ("CHAN") was the user of Target Telephone 2, iii.) both SON and CHAN were engaged in conspiracies to commit federal drug and gun offenses before December 1, 2022 and after June 27, 2023, including violations of 18 U.S.C. § 922(a)(1)(A) (unlicensed dealing in firearms), 18 U.S.C. § 933(a)(3) (firearms trafficking conspiracy), 18 U.S.C § 922(o) (unlawful possession or transfer of a machinegun), and 21 U.S.C. § 846 (drug trafficking conspiracy) (the "Target Offenses"), and iv.) an expanded search of the data extractions from the Target Telephones will yield additional evidence, fruits, and instrumentalities of the Target Offenses, more particularly described in Attachments B-1 and B-2.

4.      I am a "federal law enforcement officer" within the meaning of Fed. R. Crim. P. 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant.  I am familiar with the facts and circumstances of this investigation based upon: (a) my personal knowledge and involvement in this investigation; (b) my review of records related to this investigation; (c) information provided

to me orally and in writing by other law enforcement agents; and (d) my experience and training as a criminal investigator.  Throughout this affidavit, statements that "I know" and "I believe" certain facts are based upon this combination.

5.      Because this affidavit is submitted for the limited purpose of establishing probable cause in support of the application for the requested search warrants, I have not included each and every fact known to me or other law enforcement officers involved in this investigation.  Rather, I have included only those facts that I believe are sufficient to establish probable cause for the issuance of the requested warrant.  All times herein are approximate.

**PROBABLE CAUSE**

*Background of the Investigation*

6.      Beginning in March 2021, the FBI, Lowell Resident Agency began investigating suspected narcotics and firearms trafficking conspiracies being carried out by organized criminal groups in Lowell, including by members and associates of the street gang, the Asian Boyz.  From this investigation, I am familiar with SON and CHAN.  As described in greater detail in the affidavit submitted by ATF Special Agent Vanessa E. Flick in support of her application for the search warrant for their residence, 11 Greendale Avenue, SON and CHAN illegally trafficked firearms, ammunition, machine gun conversion devices, and methamphetamine pills to a government cooperating witness (hereinafter, "ATF CI-1") and multiple undercover officers in covert operations occurring between December 29, 2022 and June 27, 2023.  I hereby incorporate by reference the affidavit in support of Special Agent Flick's application for that search warrant

and attach it hereto at Exhibit 1.  *See* Ex. 1, Affidavit of Special Agent Vanessa E. Flick, July 26,

2023 (hereinafter, "the Flick Affidavit"), Search Warrant Case No. 23-MJ-7313-JCB.

7.      Search Warrant 23-7313 was executed on July 27, 2023.  29 items of evidence were

seized from 11 Greendale Avenue, including a handgun, ammunition, firearm parts and

accessories, and electronic devices.  Among the electronic devices were the Target Telephones.

Target Telephone 1 was found in a room in the house I believe was used by SON.[1]  Target

Telephone 2 was found in a room in the house I believe was used by CHAN.[2]

8.      Meanwhile, a Grand Jury investigation targeting SON and CHAN was underway.

On July 26, 2023, the Grand Jury returned a seven-count indictment of SON and CHAN, alleging

criminal violations of the United States Code, specifically Section 922 of Title 18 and Section 841

of Title 21.  See *United States v. Samnang Son, et al.*, 1:23-cr-10201-AK.  SON was named in six

counts, and CHAN in four counts.  They were arrested together the next day, July 27, 2023, inside

11 Greendale Avenue, and they made their initial appears in federal court later the same day.  Both

cases are currently pending.

9.      Upon seizure of the Target Telephones on July 27, 2023, investigators took

preliminary steps to secure the devices and preserve the stored data by placing them in airplane

mode and connecting them to power sources to keep them powered on.  Thereafter, on July 31,

2023, the Target Telephones were transferred to FBI custody and entered into evidence at a secure

---

[1] I believe this based on, among other facts, observations of SON's proximity to that room when law enforcement first entered the house, and because of documents bearing his name found inside that same room, including a utility bill and a Massachusetts driver's license.

[2] I believe this based on, among other facts, observations of CHAN's proximity to that room when law enforcement first entered the house, and because of documents bearing his name found inside that same room, including a Social Security number card and a Massachusetts identification card.

FBI facility in Chelsea.  On August 30, 2023, the Target Telephones were retrieved from evidence by the New England Regional Computer Forensics Laboratory ("RCFL") for forensic examination.  On December 14, 2023, the RCFL produced a technical report summarizing the results of its examinations of the Target Telephones.  According to the report, Target Telephone 1 was received in a locked state; nevertheless, a forensic tool was able to acquire a partial file system extraction.  With respect to Target Telephone 2, the device was also received in a locked state.  However, a forensic tool successfully derived the device's six-digit PIN (000000), and a full file system extraction was acquired.  A forensic examiner processed both extractions (including SIM card extractions) using forensic software to generate digital reports for further investigative review.  In my training and experience, the tools, software, and methods used by RCFL personnel generate accurate and reliable digital evidence, and I believe that the extractions of the Target Telephones and associated SIM card data that I have reviewed are accurate and reliable reproductions of the stored contents of the Target Telephones as those contents existed at the time the Target Telephones were seized.

10.     As set forth in the Flick Affidavit, SON and CHAN illegally trafficked narcotics and firearms to government witnesses on 15 dates over an extended period of time, between December 29, 2022 and June 27, 2023.  The authorization request in Search Warrant 23-7313 corresponded approximately to these dates (December 1, 2022 through June 27, 2023).  *See* Ex. 1, Att. B.  However, SON and CHAN were clearly engaged in enduring and persistent criminal activity.  Given all the facts set forth in the affidavit and the reasonable inferences that may be drawn therefrom, and upon my training and experience, I believe that the Flick Affidavit already furnished the requisite probable cause to search the Target Telephones for evidence of the narcotics

and firearms trafficking activity (the same Target Offenses) both before and after the requested dates.

11.     For instance, investigators first gained access to SON using a phone number attributed to a drug dealer prior to December 27, 2022, and later corroborated by ATF CI-1.  *See* Ex. 1 at ¶¶ 8-9.  Later during the investigation, SON described CHAN as his "switch guy," *i.e.* machine gun conversion devices, who could get "everything you need" including "guns" and "Ads," *i.e.* methamphetamine pills commonly marketed as "Adderalls."  *See id*. at ¶ 70.  They conspired to sell the methamphetamine pills and firearms.  *Id*. at ¶¶ 70-88.  Together, SON and CHAN illegally trafficked a significant volume of the contraband: nearly 4,000 methamphetamine pills, 13 firearms, five machine gun conversion devices, and over 300 rounds of ammunition.  They also openly touted their access to various narcotics and firearms suppliers with the government witnesses, and they repeatedly offered to take orders and to arrange future illicit transactions.  *See, e.g., id*. at ¶¶ 16, 24, 30, 33, 41, 50, 55, 61, 70, 72, 77.

12.     In light of the consistent and continuing criminal activity and its apparent organized nature with multiple conspirators, it is reasonable to infer that SON and CHAN were trafficking narcotics and firearms to other customers besides the government witnesses before, during, and after their dealings with the government witnesses, and that evidence of those crimes would be found in their cellular telephones.  I believe, therefore, that searches and seizures from the Target Telephones outside of the date range authorized by Search Warrant 23-7313 would not exceed the probable cause articulated in the Flick Affidavit.  Nevertheless, out of an abundance of caution and to ensure that broader searches and seizures of the Target Telephones comply with the Fourth Amendment of the U.S. Constitution and other federal laws, I now submit these applications

setting forth additional probable cause based on the contents of the Target Telephones justifying further searches and seizures, as described in Attachment B-1 and Attachment B-2.

*Target Telephone 1 Was Used By SON*

13.      I believe that Target Telephone 1 was likely used by SON for several reasons.  First, the device was seized from a room associated with SON.  Second, when Target Telephone 1 was seized, it was inside a clear, plastic protective case.  Investigators observed photographs placed in between the case and the device depicting a person they recognized as SON, together with young children who are believed to be his family members.  Third, at least two email addresses were associated with Target Telephone 1: "s.nangson@gmail.com" and "s.nangson@outlook.com".  Several different display names are linked to the display name for the email address "s.nangson@outlook.com", including "Smiley Faces", "Smiley Son", "Samnang", and "smiley loc".  Notably, I know from this investigation that "Smiley Faces" is one of the display names SON used for his Cash App account,[3] and the term "loc" is an acronym for "love of Crips" commonly appended by members and associates of Crips-affiliated gangs like the Asian Boyz, to their online and social media accounts.  Fourth, in my review of stored communications on the

---

[3] Cash App is a mobile application available to the general public that permits users to make peer-to-peer money transfers to and from other users.  Users are required to verify their true identities when registering their accounts with Cash App, but once registered, they may choose any nicknames or aliases for their accounts when transacting with other users.  I have reviewed records produced by Block, Inc., the company that operates Cash App, for the account token C_84depamkv.  I believe that SON is the user of this account for multiple reasons.  There are two verified identities of the account user: SON, with his true date of birth and last four digits of his Social Security number, and Crystal Rath, SON's wife, with her true date of birth and last four digits of her Social Security number.  Two physical addresses provided by the user of the account are historically associated with SON: 11 Greendale Avenue, where he was arrested, and 33 Spring Avenue, also in Lowell, where SON previously resided, and where, according to reports, he was arrested by officers of the Lowell Police Department in July 2016.  Several telephone numbers were added by the user of the account, including 978-941-8747 and 978-990-3233, both of which were assigned to Target Telephone 1.  Finally, the same email address, "s.nangson@outlook.com", was associated with both the Cash App account and Target Telephone 1.

device, I observed that the user of the device regularly identified as "Smiley," which is how SON was known by his confederates and co-conspirators. And "Smiley" was the same nickname he used when communicating with ATF CI-1 and the undercover officers in this case. Finally, there are two phone numbers associated with Target Telephone 1: 978-941-8747 (last used) and 978-990-3233. I am aware that phone number 978-941-8747 is the same phone number ATF CI-1 used to communicate with SON – who ATF CI-1 knew as "Smiley" – between October 24, 2022 and October 31, 2022, about purchasing a "Draco" firearm.[4]

*Evidence of Target Offenses <u>Pre-dating December 1, 2022</u> Likely Stored in Target Telephone 1*

14.     Consistent with the evidence developed in the investigation, the reviewed contents of Target Telephone 1 suggest that SON's connections to drug and firearm trafficking networks were established before the illegal transactions with ATF CI-1 beginning in December 2022, and that evidence of the Target Offenses is stored on the device in stored communications and other data earlier than December 2022, including the October 2022 communications with ATF CI-1 regarding an illegal transaction involving a "Draco" firearm.

15.     Stored communications with a Signal user, "Oum Lota," illustrate Defendant's participation in a persistent criminal enterprise.[5] "John Ike" was Defendant's alias in the Signal

---

[4] Those October 2022 communications between ATF CI-1 and "Smiley" were text messages that were preserved as evidence in this case. According to those messages, the transaction was never completed because "Smiley" claimed he could not acquire a "Draco" at the time. When ATF CI-1 was directed by law enforcement to attempt to contact "Smiley" again in December 2022, he used a different phone number – phone number 617-954-0076 – as detailed in the Flick Affidavit. *See* Ex. 1 at ¶¶ 8-9. At this time investigators have been unable to identify a telephone recovered from 11 Greendale Avenue that was assigned phone number 617-954-0076, although not all telephones seized from the location have been searched due to encryption and other security features.

[5] The Signal software application is available for download and use on mobile electronic devices like cellular telephones. Signal messages are secured by end-to-end encryption technology. Signal also permits users to automatically delete messages sent or received in the application. I know from my training and experience that individuals engaged in criminal conspiracies like drug trafficking often rely on messaging applications like Signal to further their crimes while avoiding detection by law enforcement and frustrating law enforcement efforts.

application he used on Target Telephone 1.  The earliest communication preserved from this Signal

chat was dated November 15, 2022.[6]  I observed in the chat the following exchange between SON

and "Oum Lota" (OL) on January 3, 2023, which I believe is related to three illegal deals SON

conducted with ATF CI-1 in January 2023:

| | | |
|---|---|---|
| SON | Got any ads? | 4:30:33 PM (UTC) |
| OL | Got a gpak | 4:31:09 PM (UTC) |
| SON | Ok hold on | 4:31:26 PM (UTC) |
| | Let me ask if he want a gpack | 4:31:32 PM (UTC) |
| OL | Ok | 4:31:41 PM (UTC) |
| SON | Damn he only want 300 | 4:47:47 PM (UTC) |
| | Can I give you 5 this week and 5 next week? | 5:35:34 PM (UTC) |
| OL | You taking the gpak | 5:37:06 PM (UTC) |
| SON | Yeah might as well | 5:37:18 PM (UTC) |
| | Unless you want to just give me 500 yo to you | 5:37:37 PM (UTC) |
| | Money tomorrow | 5:37:44 PM (UTC) |
| OL | I don't to break it down or count it lol | 5:38:05 PM (UTC) |
| SON | Ok I'll take the g pack | 5:38:28 PM (UTC) |
| OL | Had to tell this guy off too bc he keep asking for 200 here and there I said I'm not counting it so then he's been picking up a g | 5:39:33 PM (UTC) |
| | Ok | 5:39:34 PM (UTC) |
| SON | Ok yeah my people tok the just want small packs | 5:40:04 PM (UTC) |
| OL | Ok | 5:40:14 PM (UTC) |
| SON | Starting to get my people back | 5:40:34 PM (UTC) |
| | So let's hope shit move a little faster on both ends | 5:40:52 PM (UTC) |
| OL | That's good we need it new year | 5:40:52 PM (UTC) |
| | definitely | 5:40:57 PM (UTC) |

16.     I know from the investigation that the term "ads" is a shorthand reference to

counterfeit "Adderall" pills consisting of methamphetamine, which SON sold to ATF CI-1 and

undercover officers on multiple occasions in this investigation.  *See* Ex. 1 at ¶¶ 14-17, 23-36, 56-

---

[6] I received a report of this entire Signal chat by email from the U.S. Attorney's Office on May 2, 2024.  Approximately five hours later, I received a second email from the U.S. Attorney's Office with instructions to ignore the report because it contained data outside the authorized scope of the search warrant, both before December 1, 2022 and after June 27, 2023.  In between the first and second email, I did not review the report.  And in reviewing the contents of the Signal chat when authoring this affidavit, I have not read the contents of those communications between SON and "Oum Lota" before December 1, 2022 and after June 27, 2023.

63. In this conversation with "Oum Lota", SON conspired to source 1,000 counterfeit "Adderall" pills ("gpak") even though his customer only wanted to buy 300 pills. I believe that customer was ATF CI-1. I know from my review of records of text messages with SON preserved by ATF CI-1, that they were exchanging messages on January 3, 2023 at the same time SON was communicating with "Oum Lota" in Signal. Approximately one minute after "Oum Lota" informed SON that they had a "gpak" of "ads," SON and ATF CI-1 exchanged the following messages:

| | | |
|---|---|---|
| SON | The ads he got 1k left if you want them | 11:32:28 AM (EST) |
| ATF CI-1 | Yeah he play to much man hes not a serious guy | 11:32:41 AM (EST) |
| SON | This differnt people | 11:32:50 AM (EST) |
| | You want 1k? | 11:33:15 AM (EST) |
| ATF CI-1 | This shit is not joke. But he always doing this | 11:33:23 AM (EST) |
| SON | Facts bro | 11:33:33 AM (EST) |
| ATF CI-1 | Just a question how much would. You take for 1k you guys need to give. Better price | 11:34:28 AM (EST) |
| SON | Shit there's no better price then 2$ bro everyone else charging 3-5$ | 11:35:45 AM (EST) |
| | I try to get it cheap before it was dirt cheap | 11:36:23 AM (EST) |
| | Now it's getting harder and harder to get | 11:36:37 AM (EST) |
| | If you want right I have to wait till tomorrow when they bring it to me tonight | 11:37:02 AM (EST) |
| | He just told me the lowest he do is 1800for the 1k | 11:38:48 AM (EST) |
| ATF CI-1 | Okay half this money is my boy he dont really f with. Ads. He just  f with guns.  But i f with anything. I  cuz i know i have so many friend thats why i always sell anythings fast. | 11:44:32 AM (EST) |
| | But ill take another 300. Ads today my self | 11:46:42 AM (EST) |

SON advised ATF CI-1 that he could not conduct a deal for counterfeit "Adderall" pills that same day, January 3, 2023, because SON did not yet have a firearm he had previously agreed to illegally sell to ATF CI-1. Two days later, on January 5, 2023, SON and ATF CI-1 conducted the illegal firearms transaction (but not pills). *See* Ex. 1 at ¶¶ 18-22. And on January 10, 2023, and January

10

24, 2023, SON sold 300 counterfeit "Adderall" pills to ATF CI-1 for $2 per pill, or $600 total, on each date. *See id*. at ¶¶ 23-36.

17.     SON demonstrated his drug trafficking pedigree in these exchanges.  He negotiated the acquisition of 1,000 pills for $1 per pill from "Oum Lota" ("Can I give you 5 this week and 5 next week?", *i.e.*, $500 this week and $500 next week), and then the sale to ATF CI-1 at the price of $2 per pill ("Shit there's no better price then 2$ bro").  SON's supplier, "Oum Lota" shows characteristics of a higher-level role in the drug distribution network by their refusal to distribute smaller quantities, for instance.  I believe from the nature of their exchange and use of inclusive language (*e.g.*, "we" and "let's") that they have an established criminal rapport, and SON implied that he has returning drug customers ("Starting to get my people back") that may bolster their joint, illicit prospects.

18.     I have learned additional information from Target Telephone 1 and the investigation that leads me to believe that SON was trafficking drugs prior to December 1, 2022, and evidence of his criminal activity would be stored on the device.  For example, I know from my review of Target Telephone 1 that SON was a member of drug-related online chats through the Telegram application.[7]  Just on December 1, 2022, SON received messages from Telegram user "TOP SHELF 6iG 🦞" advertising a "page", or "1000 hits" of "LSD" for "$1,800", which I believe was an offer to sell the Schedule I controlled substance, LSD (lysergic acid diethylamide).

---

[7] Telegram Messenger is a mobile encrypted messaging service that is available for download and use on cellular telephones.  I know from my training and experience and from Telegram's website that users of Telegram can send messages, photos, videos and files of any type via private chats, as well as create groups for up to 200,000 people or channels for broadcasting to unlimited audiences.  *See* Telegram FAQ, accessible at https://telegram.org/faq#q-what-is-telegram-what-do-i-do-here (last accessed on June 9, 2024).  Like Signal, I know that Telegram is a common tool of criminals due to the service's focus on privacy and encryption, which affords users certain levels of anonymity, security, and privacy in their communications.

19.     Later on December 1, 2022, SON received two messages from Telegram user "Plugsplug menu".  I know that "plug" is a slang term use to describe a supplier of contraband, specifically drugs.  Attached to the first message from "Plugsplug menu" was an image depicting what I believe, based on my training and experience and the context of the image, to be a quantity of cocaine (below left), and the message included the words "FXX / If you know then tap in @Plugsplug04", which I interpret as an invitation to message the user directly, possibly on a different social media platform, to negotiate an illicit cocaine transaction.  An image was also attached to the second message, depicting what I believe to be a quantity of the Schedule I controlled substance MDMA (3,4-Methylenedioxymethamphetamine) (below right), with the words "Pure Purple Molly".  I know that "Molly" is a street name commonly used by drug dealers for MDMA.



20.     Data stored in Target Telephone 1 reflects continuous activity on the device since at least February 2021.  As described herein, there are numerous drug- and firearm-related communications.  Records of Snapchat communications between the account associated with Target Telephone 1, "Uncle Smiley," and a Snapchat user "Loso Wayz" begin as long ago as

December 2020.[8]  I have reviewed stored Snapchat instant messages with "Loso Wayz" from Target Telephone 1 between December 5, 2022 and June 26, 2023.  The vast majority of these communications consist of images or movies sent by "Loso Wayz" to SON, depicting what appear to be various controlled substances, firearms, and/or large sums of cash (U.S. currency).  Based on my training and experience and my review of these messages, I believe that "Loso Wayz" was using Snapchat to advertise contraband for sale to drug and firearm traffickers like SON.

21.     Furthermore, I believe that SON sourced, or attempted to source, drugs and firearms from "Loso Wayz" for resale to his customers.  For instance, on March 12, 2023, ATF CI-1 reached out to SON.  SON responded immediately by sending images of two firearms and the message "Uzi and Draco 4500", which I believe was an offer to illegally sell ATF CI-1 the pictured firearms for $4,500 total.

| | | |
|---|---|---|
| ATF CI-1 | Yoo. Whats good homi | 11:22:42 AM (EDT) |
| SON | What's up homie | 11:22:54 AM (EDT) |
| | Uzi and Draco 4500 | 11:23:44 AM (EDT) |
| | Or you want the other one up to you | 11:24:09 AM (EDT) |

---

[8] Snapchat is another electronic instant messaging application and service with emphasis on user privacy and security. The application is available for download and use on cellular telephones.  A key feature of the Snapchat application is the automatic disappearance of content (*e.g.*, pictures and messages) shared peer-to-peer.  From my training and experience, I know that individuals involved in drug and firearms trafficking like SON commonly utilize Snapchat accounts to advertise and negotiate illegal transactions, believing that the content of their communications will be unrecoverable and/or undiscoverable by law enforcement.



11:24:11 AM (EDT)



11:24:13 AM (EDT)

I discovered apparently identical images in stored Snapchat messages from "Loso Wayz" on Target Telephone 1. According to the extraction report, "Loso Wayz" sent those images to SON in Snapchat messages less than one hour before SON sent the images, above, to ATF CI-1, at 10:48:08 a.m. EDT and 10:48:12 a.m. EDT. I believe that SON, attempting to sell the pictured firearms, forwarded the very same images he received from "Loso Wayz" to ATF CI-1, knowing that if ATF CI-1 agreed to buy the pictured firearms, then he would be able to acquire them from "Loso Wayz."

14

*Evidence of Target Offenses <u>Post-dating June 27, 2023</u> Likely Stored in Target Telephone 1*

22.     Beginning on or about March 31, 2023, SON began communicating with a stored contact, "Ben Franksaw", on Target Telephone 1.  The phone number of the contact is 978-935-1053.   "Ben Franksaw" started the exchange by writing at about 3:46 p.m. (UTC), "Nigga lie / Ima need that bread u owe me foo / Dnt think I forgot".  I know from my training and experience that "bread" is a common slang term meaning money or cash.  SON asked "Who tf is this", and "Ben Franksaw" responded, "It's Grimey frm Lynn".  SON then sent a message with no text and the following image attached:



23.     I recognize the objects depicted in the image as the disassembled parts of a machinegun conversion device.  SON and CHAN illegally distributed firearms such as these to ATF CI-1 and undercover officers in this investigation on three dates: March 24, 2023; March 29, 2023; and April 14, 2023.  *See* Ex. 1 at ¶¶ 64-77.  Indeed, the gold film packaging in the image sent by SON on March 31, 2023, appears to be identical to the packaging of the machinegun conversion devices sold by CHAN two weeks later, on April 14, 2023.  Based on my training and

experience and knowledge of this investigation, I believe that the image of the machinegun conversion device that SON sent to "Ben Franksaw" implied that SON would pay the debt he owed to "Ben Franksaw" with the proceeds of the illegal sale of machinegun conversion devices.

24.     I also believe that SON and "Ben Franksaw" illegally distributed drugs together, based on their communications stored in Target Telephone 1.  For example, SON sent a video attachment in a message with no text to "Ben Franksaw" on April 19, 2023, at about 3:34 p.m. (UTC).  The video was approximately eight seconds long and depicted what I recognize from my training and experience as a wholesale quantity of cocaine in the form of a brick.  The substance was imprinted with the marking, "2 K".  I know that distributors of cocaine will often imprint their products with identifying markings as a way of conveying the quality of the substance.  A still image from the video appears below:



25.     The following exchange between SON and "Ben Franksaw" (BF) ensued after SON sent the video of the suspected cocaine, in which they discuss the appearance of the substance and reference individuals who I believe are likely distributors:

| BF  | *Laughed at a movie*      | 5:03:08 PM (UTC) |
| SON | Bro that what I'm saying   | 5:03:16 PM (UTC) |
| BF  | Looks weird asf lol        | 5:04:11 PM (UTC) |
| SON | Facts                      | 5:05:38 PM (UTC) |
| BF  | You tell em it looks funky | 5:06:19 PM (UTC) |
| SON | I did they blocked me      | 5:06:34 PM (UTC) |

Later, on May 6, 2023, SON sent the following messages to "Ben Franksaw": "Yo let me get a ball / I'll scoop".  From my training and experience, I know that "ball," or "8 ball," is a common street-level unit of distribution of cocaine meaning an 1/8 of an ounce, or 3.5 grams.  Here, SON ordered 3.5 grams of cocaine from "Ben Franksaw" and indicated he would pick up ("scoop") the drugs from "Ben Franksaw".  Based on these communications, I believe that SON and "Ben Franksaw" conspired to illegally distribute cocaine together.

26.      I believe they also conspired to distribute counterfeit "Adderall" pills.  On or about June 12, 2023, SON and "Ben Franksaw" discussed prices and quantities of illicit pills, including "Euros" with "instagram" and "snap chat" markings.  SON informed "Ben Franksaw" that he was getting "lower" prices for pills from "homies shipping it out to us" but "we have to send the cash first".  SON then demonstrated his access to a plentiful supply of illicit pills by sending the following image to "Ben Franksaw":



With the new source of supply, SON predicted to "Ben Franksaw" that "the city be flooded again"

with illicit pills.

27.     The pills depicted in the image are similar in appearance – specifically, shape, color, and markings – to the counterfeit "Adderall" pills that that SON and CHAN each sold to ATF CI-1 and undercover officers during the investigation, including on June 2, 2023, approximately ten days before this exchange with "Ben Franksaw".  *See* Ex. 1 at ¶¶ 84-88.  In addition, I am aware from the investigation that SON is a member of the Asian Boyz, and that numerous other Asian Boyz gang members were arrested in connection with the investigation, including Bill Phim ("PHIM").   SON and PHIM were arrested the same day: July 27, 2023.  When PHIM was arrested, investigators found substantial quantities of illicit pills in his possession, including pills like the "Euros" SON and "Ben Franksaw" had discussed: 962 counterfeit "Adderall" pills (299.8 grams methamphetamine, confirmed by DEA's Northeast Laboratory), 104 pink, square pills with the "Snapchat" logo (confirmed 39.9 grams MDMA), and 200 blue pills with the "Instagram" logo (confirmed 74.1 grams MDMA).

28.     I know from my review of reports of the data extraction from Target Telephone 1 that SON and "Ben Franksaw" continued to exchange messages until two days before SON's arrest and the seizure of Target Telephone 1, July 25, 2023.  I believe that the stored communications between SON and "Ben Franksaw" after June 27, 2023 likely contain further evidence of drug and firearm trafficking conspiracies.  Moreover, there are other related exchanges stored in Target Telephone 1 that demonstrate the scope and extent of ongoing conspiracies with other participants that extended beyond June 27, 2023.

29.     For example, SON had a drug customer contact stored in Target Telephone 1 as "Pheap 2".  The phone number of the contact is 978-221-1260.  On May 27, 2023, at about 6:36 p.m. (UTC), "Pheap 2" asked SON, "Can you front 500 addy and I'll give the money the same

day." I know from my knowledge of the investigation that "addy" is a common shorthand for counterfeit "Adderall" (methamphetamine) pills. "Pheap 2" told SON she needed the pills that night at "7:30" and he confirmed the order. Two days later, on May 29, 2023, I believe "Pheap 2" again asked SON for counterfeit "Adderall" pills, this time, "Are you around for 100 pack". The next day, on May 30, 2023, SON informed "Pheap 2": "I'm have my guy go meet you". Later, at about 8:07 p.m. (UTC), SON wrote to "Pheap 2", "He going text you". Meanwhile, SON had the following exchange with "Ben Franksaw" (BF):

| | | |
|---|---|---|
| SON | Yo want to meet this shorty for me | 8:04:05 PM (UTC) |
| | She buy ads for 2 | 8:04:43 PM (UTC) |
| | Just send me 50 | 8:04:50 PM (UTC) |
| | And keep her | 8:04:59 PM (UTC) |
| | She but alot a week | 8:05:12 PM (UTC) |
| BF | Where at | 8:07:10 PM (UTC) |
| SON | Lowell | 8:07:28 PM (UTC) |
| | I'm give you her number | 8:07:33 PM (UTC) |
| BF | She Asian? | 8:07:46 PM (UTC) |
| SON | Yeah | 8:07:51 PM (UTC) |
| BF | OK | 8:08:12 PM (UTC) |
| SON | +1 (978) 221-1260 | 8:08:17 PM (UTC) |

30.     Based on my training and experience and knowledge of the investigation, I believe these communications demonstrate SON brokering a deal for 100 counterfeit "Adderall" (methamphetamine) pills ("ads") between "Pheap 2" and "Ben Franksaw". Due to his familiarity with "Pheap 2" as a drug customer, SON knew that she frequently ("she but [*sic*] a lot a week") bought counterfeit "Adderall" pills for $2 each ("She buy ads for 2"). SON asked for $50 ("Just send me 50") for intermediating the deal for "Ben Franksaw". Even though SON told "Ben Franksaw" to "keep her" (as a drug customer), I know from my review of reports of the data

extraction from Target Telephone 1 that SON continued to communicate with "Pheap 2" until at least July 18, 2023.

31.     Accordingly, there is probable cause to believe that an expanded search of the data extraction from Target Telephone 1 after June 27, 2023, will yield additional evidence, fruits, and instrumentalities of the Target Offenses.

*Target Telephone 2 Was Used By CHAN*

32.     Investigators discovered Target Telephone 2 on July 27, 2023, in an apparent bedroom in 11 Greendale Avenue occupied by CHAN and possibly one other person.  Two phone numbers are associated with Target Telephone 2, one of which is 978-905-9277 – the same phone number ATF CI-1 and an undercover officer used to communicate with CHAN to negotiate and coordinate the controlled purchases of methamphetamine pills and firearms.[9]  *See* Ex. 1 at ¶ 70. Reviewing the user account data in Target Telephone 2, I observed that use of the accounts all began in a 48-hour period, between on or about June 14 and June 16, 2023.  One Apple account was used with Target Telephone 2: "billychana@icloud.com".  I also observed records of several social media accounts and mobile applications used with Target Telephone 2 that appear to belong to CHAN: a Facebook Messenger account with the name "Billy Chan" and the username "billychan"; an Instagram account with the name "Billy Chan" and the username "ebk_jr226"; an Uber account with the name "BILLY CHAN", an associated email address, "chanbilly715@gmail.com", and an associated telephone number, 978-905-9277; and a Cash App

---

[9] The other phone number is 978-990-3233, which is a phone number also associated with Target Telephone 1. However, from my review of the extraction, I observed no records of activity involving phone number 978-990-3233 stored on Target Telephone 2 beyond its association with the device.

account with $cashtag $gmanz4 and an associated email address, "billy.chan6@icloud.com".[10] Based on these facts, I believe CHAN was likely the user of Target Telephone 2, and that he likely began using Target Telephone 2 in about June 2023.

*Evidence of Target Offenses <u>Post-dating June 27, 2023</u> Likely Stored in Target Telephone 2*

33.     I observed that phone number 978-941-8747, associated with Target Telephone 1, was saved in Target Telephone 2 as the contact, "Smiley". There are records of over 900 incoming and outgoing interactions with "Smiley" stored in Target Telephone 2, including call log entries, chat messages, and device notifications, between on or about June 16, 2023 and July 25, 2023. Accordingly, I believe that CHAN remained in contact with his co-conspirator, SON, following the undercover officer's last controlled firearm deal with CHAN on June 27, 2023. And, as pertinent to these applications, I believe that evidence of the Target Offenses will likely be found in the stored data in Target Telephone 2 between June 27, 2023 and the date of its seizure, July 27, 2023. I arrive at this conclusion based on my review of the stored contents of Target Telephone 1, demonstrating the likelihood of SON's continued drug and firearms trafficking activity in that 30-day period, combined with evidence of CHAN's contacts with SON in Target Telephone 2 during the same period, and also their history of joint criminal activity. I also believe that CHAN was conspiring to illegally distribute drugs and deal in firearms after June 27, 2023, based on my review of the stored contents of Target Telephone 2.

34.     For instance, I have reviewed a portion of a chat between CHAN and a phone

---

[10] A "$cashtag" is a unique username and account identifier for sending and receiving funds in the Cash App application. I have reviewed records produced by Block, Inc. for the $gmanz4 account. While the records do not reflect any identity verification of the account user, they confirmed that the phone number 978-905-9277 and the email address "billy.chan6@icloud.com" had been associated with the account by the account user. In addition, I observed from the records that on April 19, 2023, the account user added "11 Greendale Avenue, Lowell, Massachusetts 01851" as the account address.

number, 978-703-3851, saved in Target Telephone 2's contacts as "Anem 2 Fancy".  I know from

my review of the extraction that this chat started on June 16, 2023, and continued until July 25,

2023.  In messages between June 16 and June 26, 2023, I believe that CHAN and "Anem 2 Fancy"

(A2F) discussed the use and distribution of marijuana.  And on June 26, CHAN sent a message

with an image of a firearm attached, sparking the following exchange:

| | | |
|---|---|---|
| CHAN | Gettin this tmr | 10:48:14 PM (UTC) |



| | | |
|---|---|---|
| | For 400 | 10:48:19 PM (UTC) |
| A2F | sheeeshhh | 10:50:37 PM (UTC) |
| | shi fire | 10:50:44 PM (UTC) |
| | boutta spend all my money on a q from kv | 10:51:10 PM (UTC) |
| CHAN | fucc it | 11:01:47 PM (UTC) |



| | | |
|---|---|---|
| | | 11:02:11 PM (UTC) |
| A2F | nigga said dattt | 11:02:29 PM (UTC) |

| CHAN | 1.2 | 11:02:38 PM (UTC) |
|------|-----|-------------------|
| A2F | shi been thru war | 11:02:41 PM (UTC) |
| CHAN | 556 | 11:02:45 PM (UTC) |

Based on these messages, I believe CHAN was displaying his access to the market for illegal firearms. I recognize the handgun in the first image CHAN sent to "Anem 2 Fancy", which I believe is a Taurus GC3 9mm pistol. CHAN informed "Anem 2 Fancy" that he was acquiring the firearm "for 400", or $400. In the case of the second firearm, I believe CHAN was conveying that it was a 5.56mm caliber firearm and available for $1,200 ("1.2"). This firearm appears to be a 5.56/223 caliber handgun. In response, I believe "Anem 2 Fancy" claimed he didn't have the funds to buy any guns from CHAN because he was spending "all [his] money on a q", which I believe is a reference to a quarter ounce of a controlled substance.

35.     The image of the Taurus GC3 9mm pistol was sent to CHAN earlier on June 26, 2023, in a message from the unidentified user of phone number 978-726-6407 (hereinafter, "U6407"). Based on my review of a text messages between CHAN and U6407 on June 26 and June 27, 2023, I believe that they were trafficking firearms together. U6407 started a dialogue with CHAN at 3:25 p.m. (UTC) on June 26, asking him "Niggas got anything?" CHAN responded about 10 minutes later: "nah shi dry rn / still got fmk / bouta sell it tmr / for 850 / ill do 800". U6407 replied, "I'm see who'll throw down".

36.     I know from the investigation that at the time of this exchange, CHAN and an undercover officer had already negotiated an illicit transaction for an FMK pistol, which the undercover officer intended to buy from CHAN for $850 the next day, June 27, 2023. *See* Ex. 1 at ¶¶ 89-90. Thus, in this exchange, I believe that U6407 asked CHAN if he had any firearms ("anything") for sale. CHAN responded, in sum and substance, that he only had an FMK pistol available, which he was already planning to sell for $850 the next day ("tmr"), but he would sell it for $800 if U6407 bought it. In my training and experience, U6407's response that he would

see "who'll throw down" implied that he would acquire the FMK pistol from CHAN if he could find his own buyer for the firearm (presumably for a price greater than $800).

37.     That evening, beginning about 9:22 p.m. (UTC), U6407 offered to sell CHAN a Taurus GC3 pistol ("Gc3 / Lmk").  CHAN expressed interest and asked, "how much you sellin it for / Send pic".  U6407 then sent CHAN, at 10:27 p.m. (UTC), what appears to be the same image of the Taurus GC3 9mm pistol that CHAN then sent to "Anem 2 Fancy" about 20 minutes later, at 10:48 p.m. (UTC).  CHAN then wrote, "650? / How bout 400 cash an switchn / Switchy*", which I believe was an offer to buy the Taurus GC3 pistol for $400 and a machinegun conversion device.  From the investigation, I know that CHAN had access to machinegun conversion devices, which he referred to as "switches," and he sold them for approximately $250 each.

38.     The next night, June 27, 2023, CHAN was still attempting to purchase the Taurus GC3 pistol from U6407.  At 7:12 p.m. (UTC), CHAN wrote, "You want 400 and switch today ? / Got it rn".  U6407 responded that he was at the "Barber shop rn", and CHAN asked U6407 to let him know about the firearm when U6407 was finished at the "Barber shop" ("Lmk after").  At 9:58 p.m. (UTC), after not hearing from U6407, CHAN again reached out: "You wanna do tha trade still?"  U6407 demurred, "No bullshit I'm wait for the extended mag n put the price up".  Here, based on my training and experience, I believe CHAN was eager to illegally acquire the Taurus GC3 pistol but U6407 appeared to be looking for a better price for the firearm, possibly by packaging it with an accessory like an extended magazine ("extended mag").

39.     I observed in stored communications on Target Telephone 2 that CHAN, while conspiring to illegally traffic firearms with U6407, was simultaneously negotiating with a distributor of counterfeit "Adderall" pills.  In addition to the FMK pistol, CHAN had agreed to sell 1,000 "Adderall" pills for $1,600 in the June 27, 2023 deal with the undercover officer.  *See* Ex. 1

at ¶ 90.  The day before, on June 26, at about 12:09 a.m. (UTC), the user of phone number 978-327-4405, saved in Target Telephone 2 as "Pi Suan", sent CHAN the messages: "Did you want the pacc of addy this week ? / Lmk / Also if you wanted to get more that a g pacc I can get better prices for you".  I know from this investigation and the context of the subsequent communications between CHAN and "Pi Suan" that a "g pacc" of "addy" is a reference to 1,000 counterfeit "Adderall" (methamphetamine) pills.  At about 1:58 p.m. (UTC), CHAN wrote to "Pi Suan": "i got a play for a g pacc tmr if you wanna do tha wit me / if you could bring me to do tha play and bring g pacc ill give 1000".  Here, based on my training and experience, I believe that CHAN was attempting to source the 1,000 counterfeit "Adderall" pills he had agreed to sell to the undercover officer ("tha play") from "Pi Saun" for $1,000, which CHAN knew would net him a profit of $600.

40.     Over the course of the next several hours, CHAN and "Pi Suan" exchanged messages in an unsuccessful attempt to coordinate the supply of counterfeit "Adderall" pills prior to the time of the scheduled deal with the undercover officer the next day.  Eventually, at 9:17 p.m. (UTC), CHAN and "Pi Suan" (PS) had the following exchange:

| | | |
|---|---|---|
| CHAN | Nbs if you can't tmr ima licc him | 9:17:52 PM (UTC) |
| PS | We can go early if that's coo | 9:37:09 PM (UTC) |
| CHAN | Fucc it | 9:37:55 PM (UTC) |
| PS | Better to keep him as a custi | 9:38:20 PM (UTC) |

I know from the investigation that on June 27, 2023, CHAN met the undercover officer as planned and gave him a backpack in exchange for $2,450 – the total price for both the FMK pistol and the 1,000 counterfeit "Adderall" pills.  *See* Ex. 1 at ¶¶ 89-92.  However, CHAN left the meeting with the undercover officer and did not return, and the undercover officer discovered that the backpack contained only the FMK pistol, not any pills.  *Id*. at ¶ 92.  I believe this exchange with "Pi Suan" reflected the fact that CHAN had already decided to cheat the undercover officer ("licc him") by not including the pills, in spite of the advice that it was better to keep the customer ("custi").

41.     Nevertheless, even after completing the deal and cheating the undercover officer, I believe that CHAN and "Pi Suan" continued to conspire to distribute illicit pills.  At 8:58 p.m. and 8:59 p.m. (UTC) on June 27, 2023, respectively, "Pi Suan" sent the following images attached to two messages:

 

The pills depicted in the images resemble pills purchased in the investigation by ATF CI-1 and the undercover officers, or pills seized from subjects of the investigation.  The pills in the first image (left) appear to be counterfeit "Adderall" pills, consisting of methamphetamine, and the pills in the second image (right) appear to be "Euros", which were typically pressed with stimulants like MDMA.  "Pi Suan" asked, "Did you know anyone who want euro?"  Six minutes later, CHAN responded, "I mean I do my unc said he might want a g pacc of tha for 32".  Based on the investigation, I believe that CHAN's "unc" was a reference to SON, and that CHAN and SON had discussed purchasing 1,000 "Euros" from "Pi Suan" for $3,200.  Later, "Pi Suan" advised that he could only provide 1,000 "Euros" for $6,000.  CHAN and "Pi Suan" also continued to discuss prices, quantities, and quality of "addy" (methamphetamine pills), "saw" (cocaine), and "acid"

(LSD, or lysergic acid diethylamide) in the same chat.

## DRUG TRAFFICKERS' USE OF CELLULAR TELEPHONES

42.     Based upon my knowledge, training and experience, I know that a cellular telephone is a handheld wireless device used primarily for voice communication through radio signals.  These telephones send signals through networks of transmitter/receivers called "cells," enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones now offer a broad range of capabilities.  These capabilities include but are not limited to: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and email; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones and similar portable electronic devices may also include global positioning system technology for determining the location of the device.  Based on my training, experience, and research, I know that many cellular telephones have the capabilities described above.

43.     Moreover, I know from my training and experience that cellular telephones are ubiquitous and commonly in the physical possession or control of their owners.  I also know that most drug traffickers regularly use cellular telephones to communicate about their drug trafficking activities with customers, suppliers, and other co-conspirators, and also to ascertain drug availability and pricing.  Drug traffickers are cognizant of law enforcement's use of electronic surveillance, and thus frequently change cellular telephone numbers, use multiple cellular telephones at the same time, use prepaid cellular telephones (where the subscriber of the phone is

not required to provide personal identifying information), and use privacy-focused and pseudo-anonymous mobile technology like Signal, Snapchat, Telegram, and Cash App – all applications I believe SON and CHAN were using, as referenced above – all in an effort to thwart law enforcement's use of electronic surveillance.  Because cellular telephones are often a principal means of communication and are central to the negotiation and coordination of drug trafficking, drug dealers typically keep multiple cellular telephones in close physical proximity and in their residences.  As instrumentalities of drug trafficking, the Target Telephones likely contain further evidence of violations of drug laws, *e.g.*, the Target Offenses, as discussed herein.

44.     Searches of cellular telephones of drug traffickers like SON and CHAN often yield information relating to the identities of the users of the devices, their methods of operation, and their co-conspirators and accomplices.  As set forth above, these categories of information have been found in searches of the Target Telephones.  I know, based upon my training and experience, that drug traffickers typically use cellular telephones to communicate with their suppliers, their customers, and with other co-conspirators, and that they communicate both via voice calls and text messaging.  Drug traffickers often speak in vague, guarded, or coded language when discussing their illegal business in an effort to conceal their activities from detection, and often use cellular telephones to place text messages in lieu of telephone calls to avoid speaking personally on a line that might be intercepted.  I also know that drug traffickers regularly keep records of their illegal activities stored on their cellular telephones for ease of access and convenience.  These records can include but are not limited to: contact list of buyers and sellers, ledgers of sales and money owed by customers or to suppliers, and lists of quantities and/or specific controlled substances preferred by or ordered by specific customers.

45.     In addition, individuals engaged in drug trafficking activities often take photographs or videos of their closest confederates and their drugs and drug proceeds, and they store such incriminating media on their cellular telephones, like SON and CHAN have done in the Target Telephones.  Relatedly, I know from my training and experience that drug traffickers may use social media platforms and messaging applications to post photographs and videos to advertise, increase their notoriety, and otherwise facilitate their illicit drug trade.  Social media platforms and messaging applications are typically downloaded and used on mobile electronic devices like cellular telephones.  In this case, I know that some data associated with such downloaded, third-party software is in fact accessible in the extractions of the Target Telephones, and the data has yielded evidence of the Target Offenses.

46.     Finally, I know that drug traffickers often illegally possess firearms or have access to illegal firearms, and that searches of cellular telephones used by drug traffickers frequently yield evidence of firearms offenses, including where they are stored and how and from whom they were acquired or disposed.

## FIREARMS TRAFFICKERS' USE OF CELLULAR TELEPHONES

47.     Based upon my training and experience, as well as the training and experience of other law enforcement officers I have worked with, I know that there are common practices employed by firearms and ammunition traffickers in the conduct of their illicit business, just like drug traffickers.  I know that illegal firearms and ammunition traffickers often utilize cellular telephones to further the commission of their trafficking activity. These phones may be held in the name of real or fictitious persons. Traffickers commonly change phone numbers frequently in order to limit law enforcement officials' ability to identify and track their call histories.

48.     I know that illegal firearms and ammunition traffickers often utilize cellular phones, computers, and other electronic devices to research the price and availability of firearms and

ammunition as well as acquire, pay for, and keep records of firearms and ammunition purchases. Firearms and ammunition trafficking organizations also utilize code words, slang, or deliberately vague terms for quantities and types of firearms and ammunition that are being purchased, sold, and/or transferred in effort to avoid detection by law enforcement officials. Individuals involved in illegally trafficking firearms and ammunition maintain contact information for clients and suppliers and keep them immediately available in order to efficiently conduct their illegal trafficking business. Such records may be kept in a physical format, like on paper, or in a digital format on electronic devices like the Target Telephones. From my review of the Target Telephones, I believe that SON and CHAN did in fact use these devices to facilitate firearms offenses, consistent with the common practices I have observed in my experience as an investigator.

## SEIZURE OF COMPUTER EQUIPMENT AND DATA

49.     Based on my training, experience, and information provided to me by other investigators experienced with cellular telephones and digital forensics, I know that many cellular telephones (which are included in Attachment B-1's and Attachment B-2's definitions of "hardware") can now function essentially as small computers. I am aware that individuals commonly store records of the type described in Attachments B-1 and B-2 in computer hardware, computer software, and cellular telephones, specifically. Furthermore, I know that information in computer files or remnants of such files can be recovered months or years after the files have been written, downloaded, saved, deleted, or viewed locally or over the Internet. This is true because:

a.      Electronic files that have been downloaded to a storage medium can be stored for years at little or no cost. Furthermore, when users replace their computers, they can easily transfer the data from their old computer to their new computer.

b.      Even after files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might not

occur for long periods of time.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.      Wholly apart from user-generated files, computer storage media – in particular, computers' internal hard drives – contain electronic evidence of how the computer has been used, what it has been used for, and who has used it.  This evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  It is technically possible to delete this information, but computer users typically do not erase or delete this evidence because special software is typically required for that task.

d.      Similarly, files that have been viewed over the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."  The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

e.      Data on a storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, email programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

f.      As explained herein, information stored within computer hardware and software, and other electronic storage media, may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, information stored within a computer or storage media (*e.g.*, software applications, registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner.  Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used.  For example, as described herein, computers typically

31

contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet.  Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation.  Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect.  For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data.  Such file data typically also contains information indicating when the file or image was created.  The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (*e.g.*, a digital camera or cellular phone with an incorporated camera).  The geographic and timeline information described herein may either inculpate or exculpate the computer user.  Lastly, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation.  For example, information within the computer may indicate the owner's motive and intent to commit a crime (*e.g.*, internet searches indicating criminal planning), or consciousness of guilt (*e.g.*, running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

g.      A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

h.      The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

i.      Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.  For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

j.      In addition, based on my knowledge, training, and experience, I know that businesspeople – including drug traffickers – often retain correspondence, financial, transactional, and similar records for years to identify past customers and vendors for potential future transactions; keep track of business deals; monitor

payments, debts, and expenses; resolve business disputes stemming from past transactions; prepare tax returns and other tax documents; and engage in other business-related purposes.

50.     Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrants I am applying for would permit additional forensic examinations of the Target Telephones, as necessary, to effect the seizure of stored data in expanded date ranges.  These examinations may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire contents of the device.  The electronic data may be voluminous and may require technical- or subject matter-expertise and collaboration to review completely.  Accordingly, I seek permission in these applications to transfer the Target Telephones to a computer specialist to be processed in a laboratory setting, as necessary, in order to completely and accurately retrieve data maintained in the Target Telephones, and to prevent the loss of the data either from accidental or programmed destruction.  I also request that the Court authorize review of additional seized electronic data by any government personnel assisting in the investigation, including attorneys for the government, attorney support staff, and technical experts, in addition to law enforcement officers and agents.  Finally, I request the Court's authorization to deliver a complete copy of any seized, copied, or disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

**[THIS SPACE INTENTIONALLY LEFT BLANK]**

**CONCLUSION**

51.     Based on my training and experience and for all the facts and reasons set forth herein, I submit that probable cause exists for warrants to further seize and search the Target Telephones, as described in Attachments A-1 and A-2, for evidence, fruits and instrumentalities of the Target Offenses using expanded date ranges, as described in Attachments B-1 and B-2, respectively.

Sworn under the pains and penalties of perjury,


_Jeremy D. Brisson /by Paul G. Levenson_
JEREMY D. BRISSON
Special Agent
Bureau of Alcohol, Tobacco,
Firearms and Explosives


Attested and sworn to via telephone in accordance with Federal Rule of Criminal Procedure 4.1 on September 13th 2024.

HON. PAUL G. LEVENSON
United States Magistrate Judge
District of Massachusetts