**AFFIDAVIT OF SPECIAL AGENT VANESSA FLICK IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT**

I, Vanessa E. Flick, having been duly sworn, hereby depose and state as follows:

**Introduction and Agent Background**

1.      I have been a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") since 2022.  I am an "investigative or law enforcement officer of the United States" within the meaning of Title 18, United States Code, Section 2510(7).  I am currently assigned to the Boston Group VI Field Office.  As an ATF Special Agent, my duties include the investigation of violations of laws related to firearms trafficking, firearm possession by prohibited persons, and the use of firearms in drug trafficking crimes. I am a graduate of the ATF National Academy and of the Federal Law Enforcement Training Center.  Prior to my employment with ATF, I was Detective with the Emerson College Police Department in Boston, Massachusetts for approximately one and a half years and a Police Officer with the Seattle, Washington Police Department for twelve years.  I am also a graduate of Boston College where I received a bachelor's degree in psychology.

2.      During the course of my law enforcement career, I have conducted and been involved in numerous firearms- and drug-related investigations, arrests, seizures, undercover operations and search warrants.  I have written and/or participated in the execution of numerous state and federal search warrants, and I have debriefed defendants, informants, and witnesses with personal knowledge regarding firearms and narcotics trafficking activities and the operation of firearms and narcotics trafficking organizations.

**Purpose of the Affidavit**

3.      Based on the facts set forth in this affidavit, there is probable cause to believe that SAMNANG SON (hereinafter referred to as "SON") and BILLY CHAN (hereinafter referred to

as "CHAN") have violated federal firearms and drug laws, specifically: 18 U.S.C. § 922(a)(1)(A), unlicensed dealing in firearms; 18 U.S.C §922(o), unlawful possession or transfer of a machinegun; 18 U.S.C. § 933(a)(3), firearms trafficking conspiracy; and 21 U.S.C. § 846, drug trafficking conspiracy (hereinafter, the "Target Offenses").

4.      I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant.  This affidavit is being submitted in support of an application for a warrant under Federal Rule of Criminal Procedure 41 to search 11 Greendale Avenue, Lowell, Massachusetts (the "TARGET LOCATION"), more fully described in Attachment A, because there is probable cause to believe that the TARGET LOCATION contains evidence, fruit, and instrumentalities of the Target Offenses, as described in Attachment B.

5.      The facts in this affidavit come from my personal observations and review of records and other documents, my training and experience, and information obtained from other law enforcement officers and federal agents and witnesses.  This affidavit is intended merely to show that there is probable cause for the requested complaint and does not set forth all of the information that I have learned during this investigation.

## Probable Cause

6.      I am currently investigating the drug and firearms trafficking activities of a large criminal street gang based in Lowell, Massachusetts, the Asian Boyz.  From this investigation, I am familiar with SON, a/k/a "Smiley," and CHAN, a/k/a "Juju," who associate with the Asian Boyz and deals in firearms and methamphetamine pills in and around Lowell.  For the reasons set forth herein, I believe that SON and CHAN reside together at the TARGET LOCATION.

7.     This affidavit describes conversations, negotiations, and sales of firearms, ammunition, firearms parts, and drugs by SON and CHAN to an ATF confidential informant (hereinafter, "CI-1"),[1] and undercover federal agents.  These communications and transactions occurred as part of controlled law enforcement operations, and the evidence was captured using covert video- and audio-recording devices and in preserved text message exchanges.

8.     Based on information received as a result of a joint investigation involving the ATF, the Federal Bureau of Investigation ("FBI"), and the City of Lowell Police Department, SON was identified as a potential source for controlled substances to include cocaine and methamphetamine. In December 2022, CI-1 was provided phone number (617) 954-0076 (hereinafter, "PHONE 0076") for "Smiley."  Based on the investigation, I believe that "Smiley" is SON and that SON is the user of PHONE 0076.

9.     On December 27, 2022, CI-1 sent a text message to PHONE 0076 asking "Yo, is this Smiley."  The responding text read "Yeah."  CI-1 then wrote in sum and substance, he/she was looking for "party favors."  The responding text message read " All day what you need man." CI-1 asked for "A's", which I know to be a reference to counterfeit "Adderall" (suspected methamphetamine) pills.  CI-1 asked, "How much would it cost me if I get 300?"  SON wrote "Like I said they 2$."  CI-1 and SON arranged a deal for 300 pills at the price of $2 each, totaling $600.  Later in the same message exchange, CI-1 sought to confirm the deal with SON: "600 for the 300 right." SON replied "Yeah."  SON added, "Can you toss me like 50 bucks on top? Or no,"

---

[1] CI-1 has requested that his/her identity not be revealed for fear of reprisal or harm to his/her physical safety. I am aware of CI-1's identity and have met with CI-1 personally. I believe that CI-1 has provided accurate, truthful, and reliable information to law enforcement, including the ATF, in the past and continues to do so to the present, in part because information provided by CI-1 in this case has been corroborated by audio/video recordings, surveillance, and other investigative methods. CI-1 has a criminal history which includes arrests for motor vehicle-related offenses such as operating after license suspension, as well as failing to keep motor vehicle properly insured. CI-1 has no criminal convictions. CI-1 is presently receiving monetary benefits from the ATF. CI-1 is also seeking protection from retaliation based upon CI-1's cooperation with law enforcement in this case, including possible relocation.

and CI-1 asked, "For gas money?"  SON responded, "for doing you a favor."  CI-1 and SON agreed to meet on December 29, 2022, in order to conduct the narcotics transaction discussed in the text message exchange described above.

10.     CI-1 negotiated the December 29, 2022 deal, and all subsequent deals with SON, by contacting him on PHONE 0076.

11.     As set forth below, between December 29, 2022 and June 27, 2023, SON and CHAN conducted a series of illegal firearms and drug sales that, unbeknownst to them, were surreptitiously recorded and surveilled.  I know from my personal involvement in the investigation, conversations with fellow agents, and my review of reports, that certain investigatory steps were taken before and after each of the controlled purchases described below, in order to ensure that evidence of the crimes was reliably preserved.

12.     Before every deal with SON or CHAN, CI-1 met with investigators and was provided with an undercover (UC) vehicle that was outfitted with video, audio, and transmitter surveillance equipment.  CI-1 was provided with additional recording equipment to carry on his person, as well.  Therefore, all meetings with SON and CHAN were captured by covert audio- and video-recording devices, usually from different angles and in different formats.  Investigators always searched both CI-1 and the UC vehicle, confirming that no contraband was present prior to the operation.  Finally, investigators gave CI-1 official agency funds ("OAF")[2] sufficient to accomplish the objective of completing the negotiated purchase of firearms and/or drugs from SON or CHAN.

---

[2] "Official Agency Funds" are operational expenditures intended to support specific law enforcement missions. In this case, the funds were used to purchase contraband from the subjects of the investigation in cash (U.S. currency). The serial numbers of all cash used in the operations described herein were recorded and preserved prior to being deployed with CI-1.

13.     After every deal, CI-1 immediately drove the UC vehicle to a pre-determined location to meet investigators and debrief, as instructed.  Surveillance personnel followed CI-1 back to the predetermined meeting location, where agents turned off and retrieved recorders and searched CI-1 and the UC vehicle for contraband purchased during the operation.  Investigators then interviewed CI-1, processed any evidence seized, documented the operation in reports.

### December 29, 2022 – Controlled Purchase of 300 Methamphetamine Pills

14.     On December 29, 2022, CI-1 conducted a controlled purchase of approximately 300 fake Adderall (methamphetamine) pills from SON for $650 of  in the parking lot of Yummy Express, a restaurant located at 21 Branch Street in Lowell.  Yummy Express is less than one mile from the TARGET LOCATION.

15.     At 2:17 p.m., surveillance personnel stationed in the area of Yummy Express, observed a white Honda Pilot, bearing license plate MA 3JMD99 (hereinafter, the "Honda Pilot"), driving on Middlesex Street in the direction of the restaurant.  Surveillance personnel visually confirmed the operator of the vehicle as SON. [3]  SON parked in the Yummy Express parking lot and waited. At 2:21 p.m., CI-1 arrived at Yummy Express and parked.  At 2:23 p.m., SON entered the front passenger seat of the UC vehicle.  SON remained in the UC vehicle for seven minutes before exiting, returning to his vehicle, and leaving the area.

16.     Afterwards, investigators met CI-1 and recovered three plastic bags packaged inside a larger plastic bag, each containing numerous orange, circular pills, from CI-1.  During the debrief, investigators showed CI-1 two photographs depicting SON.  CI-1 positively identified SON as the person who sold him orange, circular pills for $650 in the UC vehicle.  CI-1 reported

---

[3] Law enforcement personnel assigned to this investigation identified SON based upon familiarity with him from prior interactions in Lowell, from social media posts, and a review of SON's Driver's License photograph maintained by the Massachusetts Registry of Motor Vehicles.

that they discussed the details of buying more drugs and firearms in the future, including prices. CI-1 also reported that SON showed him/her photographs of firearms that were stored on SON's phone.

17.     Investigators field-tested a sample of the orange, circular pills obtained from SON utilizing a NiK kit, which returned a positive result for the presence of methamphetamine. The approximate weight of all pills was 104.5 grams.  Subsequent chemical analysis confirmed the pills to be mixtures and substances containing methamphetamine.

### January 5, 2023 – Controlled Purchase of a Taurus Pistol and Ammunition

18.     On January 5, 2023, CI-1 conducted a controlled purchase of a Taurus, Model:G2C, 9mm caliber pistol with an obliterated serial number and nine (9) rounds of 9mm caliber ammunition from SON in the parking lot of Yummy Express in Lowell.

19.     In a series of text messages prior to January 5, 2023, CI-1 and SON planned a deal for a Taurus pistol and ammunition for the price of $1,200.  They planned to meet again at Yummy Express.  In these communications, SON made statements implying, in sum and substance, that SON was not the owner of the firearm offered for sale, and that he would need to arrange the sale with a third party.  While negotiating the price of the pistol with CI-1, SON indicated that he could acquire additional firearms to sell CI-1.

20.     At 1:28 p.m. on January 5, 2023, investigators observed the Honda Pilot from the previous meeting parked in the Yummy Express parking lot.  At 1:37 p.m., the Honda Pilot pulled out of the lot and parked nearby along Branch Street.  At 1:38 p.m., CI-1 arrived at Yummy Express in the UC vehicle. At 1:39 p.m., SON walked through the Yummy Express parking lot with a small black bag over his shoulder, in the direction of the UC vehicle. SON entered the front passenger

seat and remained in the UC vehicle for approximately six minutes.  SON then exited the UC vehicle and returned to the Honda Pilot, which immediately left the area via Middlesex Street.

21.     Afterwards, investigators met CI-1 and recovered a black and gold Taurus, Model:G2C, 9mm caliber pistol with an obliterated serial number.  The firearm was loaded with nine rounds of 9mm caliber ammunition.

22.     During the debrief, CI-1 described meeting the same person he met on December 29, 2022, to purchase the orange, circular pills, who CI-1 knew as "Smiley."  CI-1 reported that "Smiley" entered the front passenger seat of the UC vehicle carrying a small black bag over his shoulder.  "Smiley" removed the pistol from the bag and placed it in the glove box of the UC vehicle.  CI-1 paid "Smiley" the $1,200 U.S Currency provided by the investigators for the pistol and ammunition.  Once again, CI-1 reported discussing future deals for firearms with "Smiley."

### January 10, 2023 – Controlled Purchase of Two Pistols, Ammunition, and 300 Methamphetamine Pills

23.     On January 10, 2023, CI-1 and ATF undercover agent number 6008 (hereinafter "UC 6008"), conducted the controlled purchase of a Ruger pistol, a Zastava pistol, ammunition and approximately 300 fake Adderall (methamphetamine) pills from SON in the parking lot of Yummy Express in Lowell.

24.     Once again, in a series of text messages prior to January 10, 2023, CI-1 planned the deal with SON.  Specifically, CI-1 arranged to meet SON at Yummy Express to purchase the Ruger pistol, an "AK"-type pistol (Draco), ammunition, and counterfeit "Adderall" pills from SON for a total of $3,400.  During the text message exchange, SON sent CI-1 a photograph of the Ruger pistol. CI-1 asked for and subsequently received a photo depicting the Ruger pistol and ammunition.  Later, SON informed CI-1, "Draco for sale now."  CI-1 requested a price for the

second firearm for his "other boy".  SON responded with the messages, "He want 1800" and "Comes with food and extra clip."

25.     At 3:36 p.m. on January 10, 2023, UC 6008 and CI-1 arrived together at Yummy Express in the UC vehicle and parked in the parking lot.  At approximately 3:44 p.m., investigators observed SON drive the Honda Pilot into the Yummy Express parking lot.  SON immediately exited his vehicle and approached the UC vehicle.  CI-1 and SON spoke briefly at the UC vehicle before SON returned to his vehicle and opened the rear cargo/trunk hatch.  SON appeared to remove several bags from his trunk.  SON then returned to the UC vehicle and got into the front passenger seat while holding two bags.  SON remained in the UC vehicle for four minutes.  SON then exited the UC vehicle without any bags, returned to the Honda Pilot, and immediately left the area via Branch Street.

26.     Afterwards, investigators met CI-1 and UC 6008 and recovered a black bag containing a Zastava model:ZPAP92m 7.62x39 caliber pistol with an obliterated serial number and two loaded magazines containing a total of 60 rounds of 7.62 caliber ammunition. CI-1 provided investigators with a blue backpack containing a black box, inside of which was a Ruger, Model:LC9s, 9mm caliber pistol bearing serial number #329-59949 loaded with seven rounds of 9mm ammunition, 123 loose rounds of 9mm ammunition, and three plastic bags each containing a quantity of orange/pink circular pills.

27.     During the debrief, CI-1 reported meeting the same individual who previously sold him/her a pistol and "Adderall" pills, "Smiley."  When "Smiley" entered the UC vehicle, he handed CI-1 a blue backpack, which CI-1 opened and observed a black plastic box.  CI-1 retrieved the Ruger pistol, ammunition and pills from the box, examined the items, and paid "Smiley" the $1,550 of OAF.

28.     UC 6008 reported receiving the large black bag from SON and observed that it contained the Zastava pistol, two magazines, and ammunition.  UC 6008 examined the pistol and paid "Smiley" the $1,850 of OAF.

29.     During the deal, SON introducd himself to UC 6008 as "Smiles."   UC 6008 remarked on the obliterated serial number on the Zastava pistol, thanking SON: "Oh nice... you already, like, already blotted out that serial?"  SON acknowledged, "yeah."

30.     SON discussed aspects of his firearms trafficking activity with UC 6008.  SON explained that his source regularly received firearms in bulk, that shipments arrive approximately every week, and that the firearms are sold or transferred quickly ("Whatever's left, I just let him know, whatever, okay – once it's here, people just keep grabbing it.").  According to SON, "Glocks" were the most expensive handguns to obtain, with a typical price in excess of $1,000 ("1-k and up").  The ATF UC-6008 asked, "do you ever, you ever put those, uh, those fucking switches on the backs of those Glocks?"[4]  SON responded, "Nah, I don't fuck with those, man." SON continued, describing the challenges of his role as a middleman in the firearms trafficking ecosystem, which sometimes required him to hold guns for prospective buyers without assurance of payment: "a lot of people... like, once it's gone.... I hold this for him, somebody's gonna call me for it... usually I don't have the cash up front, and I'm fronting it... y'know what I'm say? So... Guy like, yo you still got it man?"

31.     Investigators field tested a sample of the orange/pink circular pills obtained from SON utilizing NiK kit, which producd a positive result for the presence of methamphetamine. The

---

[4] I believe the word "switch" was a reference, understood by SON, to mean a machinegun conversion device.  From my training and experience, I know that a machinegun conversion device can be installed on many semiautomatic pistols.  It is a part, or combination of parts, designed and intended for use in converting a semiautomatic pistol into a machinegun; therefore, the device is itself a "machinegun".  *See* 26 U.S.C. § 5845(b).

approximate drug weight of all pills was 104.6 grams.  Subsequent chemical analysis confirmed

the pills to be mixtures and substances containing methamphetamine.

### *January 24, 2023 – Controlled Purchase of 300 Methamphetamine Pills*

32.     On January 24, 2023, CI-1 conducted a controlled purchase of approximately 300

fake Adderall (methamphetamine) pills from SON in the parking lot of Yummy Express in Lowell.

33.     In a series of text messages prior to January 24, 2023, arranged the purchase from

SON of 300 counterfeit "Adderall" pills for $600.  SON also sent CI-1 several pictures of firearms

that were purported to be available for sale.  SON referred to the source of the firearms as his

"boy" and his "guy."  CI-1 and SON also arranged for the sale of a Taurus 9mm pistol for $900

but on January 23, 2023, SON wrote to CI-1 that the pistol was no longer available.  CI-1

responded by asking if the "Adderall" pills were still available to buy, which SON confirmed.

34.     At 3:11 p.m., on January 24, 2023, CI-1 arrived at Yummy Express and parked in

the lot.  At 3:30 p.m., investigators observed SON arrive in the Yummy Express parking lot in the

Honda Pilot.  SON exited his vehicle and proceeded to get into the front passenger seat of the UC

vehicle.  SON remained in the UC vehicle for approximately two minutes.  SON then exited the

UC vehicle, returned to his vehicle, and immediately left the area via Branch Street.

35.     Afterwards, investigators met CI-1 and recovered a plastic bag which contained

three additional plastic bags that each contained numerous, orange-colored circular pills.  During

the debrief, CI-1 explained that "Smiley" arrived driving the same Honda Pilot as he had driven to

prior meetings.  CI-1 explained that a young Asian female was in the front passenger seat, and that

it looked like there were two children in the backseat of the Honda Pilot, as well.  CI-1 explained

that after "Smiley" entered the UC vehicle, he placed the plastic bags containing the pills into the

glovebox of the UC vehicle.  CI-1 paid "Smiley" $600 in OAF.  CI-1 and "Smiley" also briefly discussed a potential future deal for a Taurus pistol.

36.     Investigators field-tested a sample of the orange/pink circular pills obtained from SON utilizing a NiK kit, which returned a positive result for the presence of methamphetamine. The approximate drug weight of all pills was 110.5 grams.   Subsequent chemical analysis confirmed the pills to be mixtures and substances containing methamphetamine.

*January 27, 2023 – Controlled Purchase of a Taurus Pistol*

37.     On January 27, 2023, CI-1 conducted a controlled purchase of a Taurus, Model: G2C, 9mm caliber pistol bearing serial number #TLP48500, and four magazines from SON in the parking lot of Yummy Express in Lowell.

38.     Once again, in a series of text messages prior to January 27, 2023, CI-1 arranged to purchase a Taurus pistol and ammunition from SON for $950.   CI-1 and SON had also previously discussed the sale of this Taurus pistol during the methamphetamine pills deal three days earlier, on January 24, 2023.  Then, on January 25, 2023, SON sent CI-1 a text confirming the availability of the firearm.  CI-1 and SON agreed via text message to meet for the transaction.  .

39.     On January 27, 2023, at 12:52 p.m., surveillance was established at the TARGET LOCATION, where the Honda Pilot operated by SON during the previous four deals, was parked. At 1:06 p.m., CI-1 arrived at Yummy Express in the UC vehicle and parked in the parking lot.  At 1:10 p.m. SON left the TARGET LOCATION, driving the Honda Pilot.  Investigators followed SON when he departed the TARGET LOCATION.  At 1:12 p.m., investigators observed SON pull over and park on Branch Street, just beyond Yummy Express.  SON exited the Honda Pilot and walked towards Yummy Express parking lot.  SON walked up to the UC vehicle and

subsequently entered the front passenger seat.  SON remained in the UC vehicle for approximately

seventeen minutes.  SON then exited the UC vehicle, returned to the Honda Pilot, and left the area.

40.     SON was followed by surveillance units.  SON drove via a direct route to 146 Pine

Street in Lowell.  At 1:34 p.m., SON parked in the vicinity of 146 Pine Street and entered the

Highland Variety store.  At 1:36 p.m., SON exited Highland Variety store carrying a small black

bag in his left hand, returned to the Honda Pilot, and subsequently departed. At 1:40 p.m., SON

arrived back at the TARGET LOCATION and entered the residence, carrying what appeared to

be the same black bag from Highland Variety.

41.     Afterwards, investigators met CI-1 and recovered a Taurus, model:G2C, 9mm

caliber pistol bearing serial number #TLP48500, four magazines and a small green pouch.  During

the debrief, CI-1 explained that "Smiley" got into the front passenger seat of the UC vehicle and

retrieved the pistol and a green pouch from his pants pocket.  The green pouch contained additional

magazines for the pistol.  CI-1 examined the firearm and subsequently paid "Smiley" $950 OAF.

CI-1 and "Smiley" discussed "Smiley's" firearm and drug sources. "Smiley" talked about his

firearms source being from Maine.  CI-1 and "Smiley" discussed the possibility of additional

firearms deals in the future.

### *January 31, 2023 – Controlled Purchase of a Glock Pistol and Ammunition*

42.     On January 31, 2023, CI-1 conducted a controlled purchase of a Glock, Model: 27,

.40 caliber pistol bearing serial number DXK842US with one magazine containing approximately

four rounds of .40 caliber ammunition and a Ruger, Model: LCR .38 special caliber revolver

bearing serial #541-53446 from SON in the parking lot of Yummy Express in Lowell.

43.     In a series of text messages as well as a recorded phone call, prior to January 31,

2023, CI-1 arranged to purchase a Glock pistol, a Ruger revolver and ammunition from SON.

Specifically, on January 27, 2023, SON sent CI-1 a text containing a photograph of a Ruger revolver.  CI-1 and SON also discussed the future deal for an "AR"-type rifle.  On January 29, 2023, SON sent CI-1 two photographs, one depicting a Glock pistol and the other depicting the same Ruger revolver from two days prior.  CI-1 asked for the price, to which SON replied that the Glock was $1,000 with ammunition and the 38 special was $800 without ammunition.  SON also wrote, "Word vato don't forget to bless me my guy" to which CI-1 responded, "I got you bro ill trow [*sic*] some extra for you."  I know through training and experience, the term "bless" used by SON in this manner is a reminder to CI-1 to also compensate SON for his role in arranging the firearms transaction.

44.     On January 31, 2023, at 11:58 a.m., surveillance was established at the TARGET LOCATION, where the same Honda Pilot operated by SON during earlier deals, was parked.  At 1:16 p.m., SON was observed outside of the TARGET.  Two young children exited the residence and entered the Honda Pilot.  SON, driving the Honda Pilot, departed moments later.  At 1:24 p.m., SON arrived at 4Ms Variety, 271 School Street in Lowell.  SON and the children exited the vehicle and entered the store.  At 1:56 p.m., SON returned to the vehicle with the children. At 2:17 p.m., SON departed in the Honda Pilot.  At 2:20 p.m., SON stopped at 83 Stevens Street in Lowell and dropped off two middle school aged children.  At 2:26 p.m., SON stopped briefly at Princeton Park Apartment complex located at 678 Princeton Boulevard in Lowell.  SON departed moments later. At 2:35 p.m., SON returned to the TARGET LOCATION.  Two younger children exited the vehicle and entered the TARGET LOCATION with SON.

45.     At approximately 3:25 p.m., CI-1 arrived at Yummy Express in the UC vehicle and parked in the parking lot.  At 3:44 p.m., SON exited the TARGET LOCATION.  SON appeared to only be carrying his keys in his hands.  SON entered the Honda Pilot and departed.  SON was

followed by surveillance units.  At 3:48 p.m., SON arrived at Yummy Express and pulled into the parking lot.  SON exited the driver side door of his vehicle and went to the rear, accessing the cargo/trunk of his vehicle.  SON got into the front passenger seat of the UC vehicle.  SON remained in the UC vehicle for approximately two minutes.  SON then exited the UC vehicle and entered his own vehicle.  At 3:50 p.m., SON returned to the Honda Pilot and departed the area, followed by surveillance units.  SON returned directly to the TARGET LOCATION.

46.     Meanwhile investigators recovered a Glock, model: 27, .40 caliber pistol bearing serial #DXK842US with one magazine containing four rounds of .40 caliber ammunition and one Ruger LCR, .38 special caliber revolver bearing serial #541-53446, from CI-1.  During the debrief, CI-1 explained that "Smiley" arrived at Yummy Express, got out of the Honda Pilot, and went to his trunk.  "Smiley" then entered the UC vehicle and handed two firearms to CI-1.  CI-1 initially paid "Smiley" the $1,800 in exchange for the two firearms and ammunition.  CI-1 later paid "Smiley" an additional $100 to cover the "bless[ing]" that "Smiley" had requested, to compensate "Smiley" for arranging the sale.

### February 9, 2023 – Controlled Purchase of Taurus Pistol and Ammunition

47.     On February 9, 2023, CI-1 conducted a controlled purchase of a Taurus, Model: G3C, 9mm caliber pistol bearing serial number ACB516494 and one magazine containing 12 rounds of 9mm caliber ammunition from SON in the parking lot of Yummy Express in Lowell.

48.     In a series of text messages as well as a recorded phone call, CI-1 arranged to purchase a Taurus pistol and ammunition for $850 on February 9, 2023.  Prior to February 9, 2023, investigators installed a pole camera directed at the front of the TARGET LOCATION.  The camera recorded video continuously but did not capture any audio.

49.     On February 9, 2023, at approximately 5:16 p.m., CI-1 arrived and parked in the Yummy Express parking lot.  Agents reviewing surveillance pole camera footage noted that SON left the TARGET LOCATION in the Honda Pilot at 5:15 p.m.  At approximately 5:28 p.m., SON arrived at Yummy Express and parked in the parking lot.  SON exited the Honda Pilot and entered the front passenger seat of the UC vehicle.  SON remained in the UC vehicle for approximately six minutes.  SON then exited the UC vehicle and returned to the Honda Pilot.  SON was observed on pole camera surveillance arriving back at the TARGET LOCATION at 5:57 p.m.

50.     Investigators recovered a Taurus, model G3C, 9mm pistol bearing serial number ACB516494 and one magazine containing twelve rounds of 9mm caliber ammunition from CI-1. During the debrief, CI-1 explained to investigators that they saw "Smiley" park behind the UC vehicle and  got into the front passenger seat of the UC vehicle.  "Smiley" provided CI-1 with a black and silver pistol that contained ammunition from his sweatshirt pocket.  CI-1 paid "Smiley" the $850 OAF.  During the meeting, CI-1 and "Smiley" discussed the sales of an "AR-15" and a Glock with an extended (30 round) magazine.  "Smiley" also mentioned the availability of a Glock pistol with a "switch."  As noted earlier, I recognize, from my training and experience, the term "switch" to refer to a machinegun conversion device, or, simply, a machinegun.  "Smiley" showed CI-1 a photograph on "Smiley's" phone of the Glock with the "switch" he was proposing to sell to CI-1 in the future.  CI-1 described the photograph of the Glock to be tan/gold with an extra piece on the back.  While viewing "Smiley's" phone, CI-1 observed iPhone text messages between "Smiley" and a contact listed in the phone as "San San."

***February 13, 2023 – Controlled Purchase of "AR"-type rifle, Glock pistol, and Ammunition***

51.     On February 13, 2023, CI-1 conducted a controlled purchase of a Glock, model 19, 9mm caliber pistol bearing serial number AEGW984, one magazine containing fifteen rounds of

9mm caliber ammunition, one extended (30 round) magazine, a non-commercially manufactured .223/5.56 caliber "AR"-type rifle bearing no serial number, and one 5.56x45 caliber magazine containing twenty rounds of .223 caliber ammunition from SON in the parking lot of Yummy Express in Lowell.

52.     In a series of text messages prior to February 13, 2023, CI-1 arranged to purchase a Glock pistol, "AR"-type rifle, and ammunition from SON for $3,200.

53.     On February 13, 2023, agents reviewing pole camera surveillance video observed that SON left the TARGET LOCATION at 2:08 p.m. in the Honda Pilot.  SON arrived in the parking lot of Yummy Express at 2:10 p.m.  CI-1 arrived at Yummy Express at 2:13 p.m.  SON exited his car and opened the rear trunk/hatch before getting into the front passenger seat of the UC vehicle.  SON remained in the UC vehicle for approximately eight minutes.  SON then exited the UC vehicle and got into his vehicle before leaving the area via Branch Street at 2:24 p.m.  SON was observed via pole camera surveillance arriving back at the TARGET LOCATION at 2:26 p.m.

54.     Afterwards, investigators recovered from CI-1 a Glock, model 19, 9mm caliber pistol bearing serial #AEGW984, a 9mm caliber magazine containing fifteen (15) rounds of 9mm caliber ammunition, an extended (30 round) 9mm caliber magazine, a non-commercially manufactured.223/5.56 caliber "AR"-type rifle bearing no serial number, and a 5.56x45 caliber magazine containing twenty (20) rounds of .223 caliber ammunition, all of which was purchased from SON.

55.     CI-1 explained that "Smiley" was already in the parking lot of Yummy Express, and they parked next to "Smiley's" vehicle.  "Smiley" retrieved the "AR," which was covered by a white towel, from the rear hatch/trunk compartment of the Honda Pilot.  "Smiley" opened the front passenger door of the UC vehicle and placed the "AR" – still covered by the towel – into the

vehicle.  After "Smiley" sat down in the UC vehicle, he removed a Glock pistol from his jacket pocket and provided it to CI-1. "Smiley" also provided a small pistol magazine containing ammunition, an empty extended pistol magazine, and a rifle magazine containing ammunition. "Smiley" told CI-1 that the rifle ("AR") was held at "his boy's" house and that it came from Maine. CI-1 paid "Smiley" $3,200 in exchange for the pistol, rifle, magazines, and ammunition.  CI-1 and "Smiley" discussed the future sale of firearms, specifically a Glock pistol and a "switch."

### *March 13, 2023 – Controlled Purchase of 1,000 Methamphetamine Pills*

56.     On March 13, 2023, CI-1 and an FBI undercover agent (hereinafter, "FBI UC"), conducted the controlled purchase approximately 1,000 fake Adderall (methamphetamine) pills from SON in the parking lot of Yummy Express in Lowell.

57.     Once again, in a series of text messages and recorded phone calls prior to March 13, 2023, CI-1 planned the deal with SON.  Specifically, CI-1 arranged to meet SON at Yummy Express to purchase the counterfeit "Adderall" pills from SON for a total of $1,600.

58.     Surveillance units observed the Honda Pilot parked at Yummy Express at 3:30 p.m. At 3:34 p.m., the Honda Pilot departed and arrived back at the TARGET LOCATION at 3:37 p.m. Surveillance units observed SON exit the vehicle and enter the TARGET LOCATION.  At 4:22 p.m., SON exited the TARGET LOCATION and went to the rear cargo/trunk/hatch area of the Honda Pilot, where he placed two black trash bags. Surveillance units noted that SON was observed leaving the TARGET LOCATION at 4:25 p.m. in the Honda Pilot.

59.      FBI UC and CI-1 arrived at the parking lot of Yummy Express at approximately 4:38 p.m.  SON arrived in the parking lot of Yummy Express driving the Honda Pilot at 4:39 p.m. SON parked his vehicle, exited the driver seat, and entered the front passenger seat of the UC vehicle.  After a few minutes, SON exited the UC vehicle, returned to his vehicle, and left the

parking lot.  Pole camera surveillance showed SON walking in front of the TARGET LOCATION at 5:02 p.m.

60.     Investigators recovered a Ziploc baggie full of orange pills form the FBI UC. During the debrief, CI-1 stated after CI-1 and the FBI UC arrived and parked in the parking lot, "Smiley" got into the front passenger seat of the UC vehicle next to the FBI UC.  "Smiley" placed the Ziploc baggie full of pills on the center console and the FBI UC provided "Smiley" with the $1,600 OFA.

61.     While in the UC vehicle, the FBI UC, CI-1, and SON discussed the illegal firearms market, including "switches."  The FBI UC asked about where SON obtained firearms, specifically the non-commercially manufactured "AK"-type rifle that SON had previously sold to CI-1.  SON explained that it had come from someone in Maine, and that he had multiple sources of firearms. Demonstrating his knowledge of the criminal nature of firearm trafficking, SON noted that "his boy" in Maine was "risking his license" because the purchases were "registered under his name, so if anything happens, that's on him."  SON also described his preference for one supplier over another, the latter of whom was "too expensive."  Showing that he believed that CI-1 was also in the business of reselling firearms for profit, SON stated that he would probably stop going to the "expensive" source, "because if my guy can't eat," then, in sum and substance, the deals weren't worth making.  In my training and experience, I believe that "eating" in the context of the illegal firearms trade is a synonym for profiting.

62.     With respect to "switches," SON acknowledged that they were "machineguns" and he didn't like holding on to them ("I don't sit on them").  SON also said that he doesn't like to deal with anything that carries a 10-year prison sentence, which was why he didn't want to hold on to them ("don't want to do 10 years").  SON then suggested that he was afraid to drive around with

guns, and he likes putting them in bags when transporting them ("I just grab it and go... I put it in my trunk or whatever... you know what I'm saying?  Because I ain't trying to do no time or nothing").  Later, addressing the FBI UC, SON expressly acknowledged his profits from dealing with CI-1: "man, I just... cause when I make the play for him (CI-1) you know what I'm saying? He'll give me money on top... and if he (pointing to CI-1) give me a hundred, my other guy give me a hundred, you know what I'm saying? Boom, all set, I go back to work."

63.    Investigators field-tested a sample of the orange, circular pills obtained from SON utilizing a NiK kit, which returned a positive result for the presence of methamphetamine. The approximate weight of all pills was 380.9 grams.  Subsequent chemical analysis confirmed the pills to be mixtures and substances containing methamphetamine.

### March 24, 2023 – Controlled Purchase of Smith & Wesson Pistol, Machinegun Conversion Device, and Ammunition

64.    On March 24, 2023, CI-1 conducted the controlled purchase of a Smith & Wesson, model M&P 9 Shield, 9mm caliber pistol bearing serial number HDY0133, a Glock-type "switch" (machinegun conversion device), and seven rounds of ammunition from SON in the parking lot of New Asian Market, located at 35 Willie Street in Lowell.

65.    In a series of text messages prior to March 24, 2023, CI-1 and SON planned a deal for a Smith & Wesson pistol, Glock type switch and ammunition for a total of $1,850.

66.    On March 24, 2023, pole camera surveillance video depicted SON leaving the TARGET LOCATION at 10:50 a.m.  CI-1 arrived at the New Asian Market at 11:08 a.m. and parked in the parking lot.  At about the same time, surveillance personnel observed the Honda Pilot parking on Broadway Street, in the area of the Broadway Laundromat.  SON appeared to enter and exit the Broadway Laundromat before walking towards the UC vehicle at 11:09 a.m.  SON entered the front passenger seat of the UC vehicle and remained for approximately five minutes. At

approximately 11:14 a.m, SON exited the UC vehicle and returned to the Laundromat.   Pole camera surveillance video of the TARGET LOCATION showed SON returning to the location at 11:19 a.m. in the Honda Pilot.

67.     Afterwards, investigators debriefed CI-1 and recovered, a Smith & Wesson, Model: M&P 9 Shield, 9mm caliber pistol bearing serial #HDY0133, a Glock-type "switch," and seven rounds of ammunition, all of which was purchased from SON.   During the debrief, CI-1 told investigators that "Smiley" had requested to meet CI-1 at the new location, in the New Asian Market parking lot.   Once in the UC vehicle, "Smiley" pulled the firearm and "switch" out of his front hoodie pocket and presented both to CI-1.   "Smiley" instructed CI-1 on assembling the "switch" due to the fact that it was in pieces.   CI-1 gave "Smiley" with $1,850 OFA. CI-1 and "Smiley" discussed potential future purchases of "switches," specifically that if CI-1 purchased 4 "switches," the bulk price would be $800 per "switch," totaling $3,200. At the conclusion of the purchase, "Smiley" exited the vehicle and walked into the Laundromat via a door located within the shopping complex.   CI-1 was able to observe "Smiley" exit the Laundromat via a backdoor moments later and get into his Honda Pilot and leave the area.

***March 29, 2023 – Controlled Purchase of Two Machinegun Conversion Devices***

68.     On March 29, 2023, CI-1 conducted a controlled purchase of two machinegun conversion devices from CHAN[5] in the parking lot of New Asian Market in Lowell.

69.     In a text messages conversation on March 28, 2023, CI-1 and CHAN planned a deal for a two "switches" for a total of $1,700.

70.     After buying one machinegun conversion device from SON on March 24, 2023, CI-1 expressed interest in buying more.   However, before the March 29, 2023 deal, SON handed

---

[5] Investigators identified CHAN by reviewing social media posts and viewing a Driver's License photograph maintained by the Massachusetts Registry of Motor Vehicles.

CI-1 off to CHAN – who he described as his "switch guy" – via text message.  SON claimed that he needed to focus on his family, and CHAN had everything CI-1 needed, including the fake Adderalls ("Ads and all").

| 2023/03/28 | 12:26:07 PM | 617-954-0076 (SON) | I'm give you my switch guy he also have guns fs sometimes lmk I can link you guys |
| 2023/03/28 | 12:26:31 PM | 617-954-0076 (SON) | I need to focus on my familia |
| 2023/03/28 | 12:26:51 PM | 617-954-0076 (SON) | He got everything you need |
| 2023/03/28 | 12:26:59 PM | 617-954-0076 (SON) | Ads and all |

SON then sent CHAN's phone number to CI-1, introducing him as "Juju" and describing him as a "cool kid" who just wants to "make money like all is."

| 2023/03/28 | 12:43:07 PM | CI-1 | Send me hes phone number papa ill hit em up tell him im cool bro you know me |
| 2023/03/28 | 12:43:28 PM | 617-954-0076 (SON) | Yeah I will let me ask him if it's ok first on vato |
| 2023/03/28 | 12:43:39 PM | CI-1 | I dont want games bro tell him be real with me like the way you are with me |
| 2023/03/28 | 01:18:57 PM | 617-954-0076 (SON) | 9789059277 his name juju |
| 2023/03/28 | 01:23:21 PM | CI-1 | Aight bet hes cool right |
| 2023/03/28 | 01:23:50 PM | 617-954-0076 (SON) | He cool kid just want to make money you know like all is |

CI-1 then reached out to "Juju" (CHAN) at 978-905-9277 (hereinafter, PHONE 9277).  CHAN indicated that "Smiley" (SON) had told him about CI-28105.  CHAN informed CI-28105 that he had switches (machinegun conversion devices) and was working on guns "to come in."

| 2023/03/28 | 01:33:29 PM | CI-1 | Hey whats good bro its me alex smileys friend |
| 2023/03/28 | 01:39:42 PM | 978-905-9277 (CHAN) | Yea wassup smiley told me about you |
| 2023/03/28 | 01:39:51 PM | 978-905-9277 (CHAN) | I'm juju |
| 2023/03/28 | 01:40:43 PM | CI-1 | Nice talking to you bro yeah whay you got bro smiley told me you got everything i need |
| 2023/03/28 | 01:41:22 PM | 978-905-9277 (CHAN) | Guns workin on it right now to come in |
| 2023/03/28 | 01:41:37 PM | 978-905-9277 (CHAN) | Got switches right now |

All deals with CHAN described herein were arranged by text message by contacting him on PHONE 9277.

71.     On March 29, 2023, pole camera surveillance video at the TARGET LOCATION recorded two subjects in the Honda Pilot, which departed the TARGET LOCATION at 12:00 p.m. At approximately 12:32 P.M., surveillance units stationed in the area of the New Asian Market

observed the Honda Pilot, operated by SON with CHAN in the front seat.  CI-1 arrived in the

parking lot at 12:36 p.m.  SON appeared to drop CHAN off short of the New Asian Market at

approximately 12:41 p.m., and CHAN walked into the parking lot at 12:44 p.m. CHAN entered

the Laundromat briefly, exited, and then met CI-1 at approximately 12:46 p.m.  CHAN remained

in the UC vehicle for approximately seven minutes. CHAN exited the UC vehicle at 12:53 P.M.

and walked back into the Laundromat. At 12:54 p.m., surveillance personnel observed the Honda

Pilot parked in the alley of 423 Broadway, near the Laundromat.  CHAN exited the alley by the

laundromat and got into the Honda Pilot's passenger seat. The Honda Pilot then left the area. The

Honda Pilot was observed on pole camera video returning to the TARGET LOCATION at 2:30

P.M.

72.     Investigators recovered two small plastic bags, each one containing a machinegun

conversion device purchased by CI-1 from CHAN.  During the debrief, CI-1 told investigators that

a young Asian male entered the front passenger seat of the UC vehicle and confirmed he was

"JuJu." "JuJu" took two small bags out of his pocket and gave them to CI-1. CI-1 inspected the

contents of the bags and determined the items within were "switches." CI-1 paid "JuJu" $1,700

OFA.  CI-1 and "JuJu" discussed the future sale of additional "switches." "JuJu" told CI-1 that he

works at a machine shop and can make "switches" as well as other gun parts.  "JuJu" told CI-1

that he can order switches, which would take approximately one week to come through the mail.

"JuJu" then exited the UC vehicle and walked back towards the laundromat.

### April 14, 2023, Controlled Purchase of Smith & Wesson Pistol, Glock Pistol, Two Machinegun Conversion Devices, and Ammunition

73.     On April 14, 2023, CI-1 conducted a controlled purchase of one Smith & Wesson,

Model M&P, .40 caliber pistol bearing serial # HTN3766, one Glock, Model: 17, 9mm caliber

pistol bearing serial #UMT425, two machinegun conversion devices, magazines, and ammunition from CHAN in the parking lot of New Asian Market in Lowell.

74.     In a series of text messages prior to April 14, 2023, CI-1 and CHAN planned a deal for a Smith & Wesson pistol, Glock pistol, two Glock-type "switches" and ammunition for a total of $3,500.

75.     On April 14, 2023, surveillance personnel outside the TARGET LOCATION observed the Honda Pilot parked in the driveway at 1:19 p.m.  At 1:33 p.m., the Honda Pilot, driven by SON with CHAN as the front passenger, departed the driveway of the TARGET LOCATION and drove by the New Asian Market at 1:39 p.m. At 1:42 p.m., the Honda Pilot parked at the intersection of Cross Street and Willie Street, a short distance from the New Asian Market parking lot. At approximately 1:59 p.m., CI-1 arrived and parked in the lot.  CHAN, carrying a black satchel-type bag, approached the UC vehicle on foot and entered the front passenger seat. CHAN remained in the UC vehicle for approximately ten minutes, exiting at 2:09 p.m. CHAN walked into entered the Laundromat via the parking lot door of the business.  Surveillance personnel in the Laundromat observed CHAN walk through the laundromat and exit via the Broadway Street door.

76.     At approximately 2:10 p.m., CHAN returned to the Honda Pilot. Surveillance personnel followed the Honda Pilot as it left the area and navigated to 4 M's Variety located at 271 School Street at 2:12 p.m.  At 2:14 p.m., CHAN and an unknown passenger from the rear seat exited the Honda Pilot.  CHAN and that unknown passenger entered 4 M's Variety Store. At 2:16 p.m., CHAN got back into the front passenger seat of the Honda Pilot, which departed the area. At 2:24 p.m., the Honda Pilot arrived and parked in front of the 7-Eleven store at 55 Chelmsford Street in Lowell.  At 2:24 p.m., SON and CHAN entered the 7-Eleven for five minutes and then

left in the Honda Pilot.  At 2:35 p.m., the Honda Pilot parked in front of the TARGET LOCATION.

CHAN and SON remained in the vehicle while two other occupants exited the vehicle.  The Honda

Pilot then departed the TARGET LOCATION at 2:45 p.m. and was next seen returning to the

TARGET LOCATION at 3:20 p.m.

77.     After the controlled purchase, investigators debriefed CI-1 and recovered a Smith

& Wesson, Model: M&P 40, .40 caliber pistol bearing serial #HTN3766, a Glock, Model: 17, 9mm

caliber pistol bearing serial #UMT425, two machinegun conversion devices, and magazines and

ammunition.   During the debrief, CI-1 told investigators CI-1 observed "Juju" exit the front

passenger seat of "Smiley's" car, parked on the street behind the parking lot of New Asian Market,

and walk towards the UC vehicle.  "Juju" entered the UC vehicle carrying a small black bag.

"Juju" handed the bag to CI-1.  When CI-1 opened the bag, he saw that the bag contained two

pistols, magazines, ammunition and two "switches."  CI-1 paid "Juju" the $3,500 OFA for the

items.  "Juju" and CI-1 discussed the future sale of additional firearms as well as "switches." CI-

1 and "Juju" also discussed the process and duration of time it would take to install a "switch"

onto a pistol.

### *May 12, 2023 – Controlled Purchase of 1,000 Methamphetamine pills*

78.     On May 12, 2023, FBI UC conducted a controlled purchase of 1,000 fake Adderall

(methamphetamine) pills from CHAN in the parking lot of New Asian Market in Lowell.

79.     In a series of text messages prior to May 12, 2023, FBI UC and CHAN planned a

deal for FBI UC to purchase 1,000 "Adderall" pills for $1,600.

80.     On May 12, 2023, surveillance units followed the white Honda Pilot from previous

meets and observed the Honda Pilot being driven by SON and CHAN as the front passenger in the

vicinity of School Street and Western Ave in Lowell, MA. At 1:03 P.M., the Honda Pilot arrived

at the TARGET LOCATION. SON and CHAN exited the vehicle and entered the TARGET LOCATION. At 1:09 P.M., SON and CHAN and a young child exited the TARGET LOCATION and drove to a car wash. At 1:23 P.M., the Honda Pilot departed the car wash and travelled Broadway Street towards 35 Willie Street. SON and CHAN arrived at the New Asian Market Plaza and parked on Broadway Street, next to the Broadway Street entrance of the Broadway Super laundromat. FBI UC arrived and parked in the parking lot of New Asian Market Plaza at 1:38 P.M.. CHAN exited the Honda Pilot and entered the laundromat via the Broadway Street entrance, exiting moments later via the Willie Street entrance of the laundromat. CHAN entered the UC vehicle at 1:39 P.M.. CHAN was in the UC vehicle for approximately seven minutes. CHAN exited the UC vehicle and entered the laundromat via the Willie Street entrance, exiting the laundromat via the Broadway Street entrance moments later. CHAN entered the Honda Pilot.

81.     The Honda Pilot travelled to 4 M's Variety, located at 271 School Street, at approximately 1:49 P.M.. At 2:14 P.M., the Honda Pilot travelled to the area of 112 Forest Street. An unknown passenger exited and walked towards the building. At 2:33 P.M., the Honda Pilot arrived back at the TARGET LOCATION. CHAN exited the vehicle and entered the TARGET LOCATION.

82.     Surveillance followed FBI UC back to the pre-determined meeting location after the meet with CHAN, where agents turned off and retrieved the recorders, searched the UC vehicle with negative results and recovered a brown paper bag with "Tavern in the Square" written on it. Inside the paper bag, Investigators recovered a plastic Ziploc bag containing numerous circular orange pills purchased from CHAN.

83.     Investigators field-tested a sample of the orange, circular pills obtained from CHAN utilizing a TruNarc system, which returned a positive result for the presence for Fentanyl

Compound or methamphetamine. The approximate weight of all pills was 393.1 grams. Subsequent chemical analysis confirmed the pills to be mixtures and substances containing methamphetamine.

### June 2, 2023 – Controlled Purchase of 1,000 Methamphetamine Pills

84.　　On June 2, 2023, FBI UC conducted a controlled purchase of 1,000 fake Adderall (methamphetamine) pills from CHAN in the parking lot of Pailin Plaza, located at 716 Middlesex Street in Lowell.

85.　　In a series of text messages prior to June 2, 2023, FBI UC and CHAN planned a deal for FBI UC to purchase 1,000 "Adderall" pills for $1,600.

86.　　On June 2, 2023, surveillance personnel positioned at the TARGET LOCATION made the following observations: at 10:49 a.m., SON exited the TARGET LOCATION and placed an item into the trunk of a black Honda Civic, bearing license plate MA 5HGX81 (hereinafter, the "Honda Civic").[6]  At 10:51 a.m., the Honda Civic departed the TARGET LOCATION with SON driving and CHAN as the passenger.  The Honda Civic arrived in the area of Pailin Plaza at 11:13 a.m.  CHAN exited the vehicle.  The Honda Civic then drove around to the rear of Pailin Plaza where CHAN re-entered the vehicle.  At 11:17 a.m., FBI UC arrived at the parking lot of Pailin Plaza.  At 11:18 a.m., CHAN exited the Honda Civic and entered the rear door of a restaurant of the plaza.  CHAN then walked out of the front of the plaza, approached the UC vehicle, and entered.  CHAN was in the UC vehicle for approximately three minutes, exiting at 11:21 a.m.  CHAN then cut back through the Pailin Plaza restaurant to return to the Honda Civic, where SON was waiting.

---

[6] According to Massachusetts Registry of Motor Vehicles records, the registered owner is "Samnang Son" at 33 Spring Avenue, Lowell, Massachusetts.

87.     SON and CHAN then drove away from the plaza to a nearby Auto Zone, arriving at 11:29 a.m.  Shortly thereafter, at 11:41 a.m., SON, CHAN, and a minor child left the Auto Zone. They departed in the Honda Civic at 11:45 a.m. and drove to the parking lot of EbLens, a clothing retailer, located at 211 Plain Street in Lowell.  At 11:56 a.m., SON, CHAN and the minor child entered EbLens together.  Four minutes later, at approximately 12:00 p.m., they returned to the Honda Civic. They arrived back at the TARGET LOCATION together at 12:05 p.m.

88.     Investigators field-tested a sample of the orange, circular pills obtained from CHAN utilizing a TruNarc system, which returned a positive result for the presence for methamphetamine. The approximate weight of all pills was 393.3 grams.  Subsequent chemical analysis confirmed the pills to be mixtures and substances containing methamphetamine.

### June 27, 2023 – Controlled Purchase of FMK pistol and Ammunition

89.     On June 27, 2023, FBI UC conducted a controlled purchase of one FMK, model 9C1, 9mm, bearing serial number BTT0245, and ammunition purchased from CHAN in front of 66 Cambridge Street in Lowell.  This address is around the corner, approximately one-tenth of a mile, from the TARGET LOCATION.

90.     In a series of text messages prior to June 27, 2023, FBI UC and CHAN planned a deal for 1,000 "Adderall" pills, an FMK pistol and ammunition from CHAN.  The total price for the items was $2,450.  Specifically, $1,600 for the "Adderall" pills and $850 for the pistol.  On June 26, 2023, CHAN messaged the FBI UC, "Ima have you come to my address tomorrow / Going to be in a rush to visit my dad".  The FBI UC responded, "Word I'll hit you up when I'm close, I appreciate you.  What the address I'm going to?"  CHAN wrote back, "66 Cambridge st lowell ma".

91.     On June 27, 2023, surveillance personnel positioned in the vicinity of the TARGET LOCATION observed the following: the FBI UC arrived in front of 66 Cambridge Street at 12:34 p.m.  The FBI UC sent a message to CHAN, "Think I'm here".  Approximately two minutes later, at 12:36 p.m., CHAN exited the TARGET LOCATION via the front door and walked southeast on Greendale Avenue.  CHAN cut through houses between 56 and 62 Cambridge Street from Greendale Avenue, and entered the UC vehicle.  CHAN remained in the UC vehicle for approximately eight minutes.  In that time, they exchanged $2,450 OAF and a gray backpack. CHAN exited the UC vehicle at 12:44 p.m. and walked back the same direction and into the front door of the TARGET LOCATION.  At 1:08 p.m., CHAN left the TARGET LOCATION and entered a black Tesla sedan, which then left the area.

92.     The gray backpack CHAN gave to the FBI UC contained a black bag, inside of which was a FMK model 9C1, 9mm, bearing serial number BTT0245, and six rounds of 9mm caliber ammunition, and also a bank card bearing the name "Billy Chan."  Notably, the bag did not contain any pills.

### *Applicable Federal Firearms Laws and Regulations*

93.     From my training and experience, I know that federal law requires anyone in the business of dealing firearms to apply to the ATF and obtain a license.  Among the conditions of becoming a Federal Firearms Licensee ("FFL"), an applicant must be at least 21 years old and be legally allowed to possess firearms and ammunition.  I know from the investigation that CHAN's year of birth is 2005; hence, he is 18 years old.  I also know from the investigation that in 2017, SON was convicted in the Lowell District Court under docket number 1611CR006089 of two crimes under Massachusetts law, each with a maximum penalty of two-and-a-half years imprisonment:  Assault and Battery on a Police Officer, in violation of M.G.L. c. 265 § 13D, and

Resisting Arrest, in violation of M.G.L. c. 268 § 32B.  Therefore, SON is a prohibited person under 18 U.S.C. § 922(g)(1), and may not lawfully possess a firearm or ammunition.  Furthermore, a query of ATF's Federal Licensing System, a digital repository of FFL licenses and applications, with SON's and CHAN's names and dates of birth produced no results.  I believe that the absence of records in the System indicates that SON and CHAN do not currently possess a federal license to deal firearms and have not possessed such license at any time during this investigation; hence, they could not have lawfully been engaged in the business of dealing firearms at the time of the transfers to CI-1 and undercover officers described above.

94.     I am also aware from my training and experience that, with very few exceptions, it is a criminal offense to possess or transfer a machinegun pursuant to 18 U.S.C. § 922(o).  Only machineguns lawfully possessed, *i.e.*, registered with the ATF, prior to 1986 may be lawfully transferred or possessed by non-governmental entities today.  The machinegun conversion devices sold by SON and CHAN have been examined in this case.  The devices bear no serial numbers or visible markings of any kind.  Therefore, the devices cannot be registered as required by federal law.  The examination further demonstrated that the devices are designed and intended, when fully assembled, for use in converting a weapon into a machinegun, *i.e.* a weapon which shoots automatically more than one shot, without manual reloading, by a single function of the trigger. 26 U.S.C. § 5845(b).  Accordingly, I believe that mere possession and transfer of machinegun conversion devices, or "switches," by SON and CHAN during the sales of those items to CI-1, as described above, constituted a criminal violation.

**Probable Cause that Evidence, Fruits, and Instrumentalities of the Target Offense will be found at the TARGET LOCATION**

95.     I have probable cause to believe that evidence, fruits, and instrumentalities of the Target Offenses, as described in Attachment B, will be found in the TARGET LOCATION.

96.     Based on the foregoing facts, there is probable cause to believe that SON and CHAN reside together at the TARGET LOCATION.   Beginning on December 29, 2022, and continuing regularly for several months, SON met CI-1 in the Yummy Express parking lot, less than a mile away from the TARGET LOCATION to sell methamphetamine pills and firearms.  On January 27, 2023, and in all subsequent controlled purchases since, investigators surveilled SON and CHAN prior to the controlled purchases and confirmed that they always began at the TARGET LOCATION.

97.     Electronic and physical surveillance established more than just the fact that SON and CHAN traveled back-and-forth from the TARGET LOCATION to conduct every drug and gun deal with CI-1 and the undercover officers.  The observations of SON and CHAN described herein are consistent with their residency at the TARGET LOCATION.  On multiple occasions investigators observed SON and CHAN entering and exiting the TARGET LOCATION through the front door, suggesting that they had unrestricted access.  Both cars that SON drove to the deals – the Honda Pilot and the Honda Civic – were regularly observed parked at the TARGET LOCATION.  In addition, on several occasions SON was observed with children at the TARGET LOCATION, and SON and CHAN frequently embarked on round-trip drives with children, beginning and ending at the TARGET LOCATION.

98.     According to records of the Massachusetts Registry of Motor Vehicles, the Honda Pilot that SON routinely drives is registered at the TARGET LOCATION.  In addition, I am aware of a recent incident occurring on June 30, 2023, and documented by the Chelmsford Police

Department, at a Walmart where one of SON's children, Aytone Son, was caught shoplifting. Aytone lied about his age and home address to police officers when questioned. A police officer then contacted SON's wife, Crystal Rath. The report documented Crystal Rath's statements to the police officer, including her confirmation that Aytone currently lived with her and her husband, SON, at the TARGET LOCATION.

99.     There is probable cause to believe that certain evidence of drug and firearms trafficking will be found in the TARGET LOCATION. On multiple dates, SON and CHAN traveled directly to a pre-arranged gun or drug deal from the TARGET LOCATION, specifically February 13, 2023 (SON arrived at Yummy express two minutes after leaving TARGET LOCATION), and June 27, 2023 (CHAN arrived at UC vehicle two minutes after leaving TARGET LOCATION). The immediate temporal and geographic proximity of the illicit transaction to the TARGET LOCATION suggests that firearms or evidence of firearms transactions will be found at the TARGET LOCATION. In addition, SON regularly referred to having sources with access to firearms coming out of Maine and the Boston-area, from whom SON purchased firearms. I know from my training and experience that even illegal firearms transactions have byproducts that may be found in a residence. Given that SON and CHAN are trafficking in a significant number of firearms, they likely have evidence of those purchases, acquisitions, or dispositions, such as firearms boxes, manuals and guides, receipts, notes, and other documentation. I also believe that CHAN and SON are likely storing instrumentalities and evidence of the Target Offense in their home, the TARGET LOCATION. For instance, CHAN stated to CI-1 that he made "switches" and other gun parts, and that he received gun parts taking two weeks to come in. Evidence of these activities is evidence of the Target Offenses, and likely to be found at the TARGET LOCATION.

100.    Cellular telephones used by SON and CHAN to facilitate the Target Offenses are also likely to be found at the TARGET LOCATION.  I am aware that SON and CHAN used smartphones to communicate with CI-1 and the FBI UC, as described above.  Indeed, the central role that smartphones played in the commission of the Target Offenses cannot be overstated.  SON and CHAN brokered firearms transactions with CI-1 and the FBI UC in large part by sharing digital images of available firearms and negotiating the terms of deals in electronic communications.  PHONE 0076 (SON) and PHONE 9277 (CHAN) are evidence of the Target Offenses, contain stored information likely to constitute evidence of the Target Offenses, and are likely to be with their users, SON and CHAN, at the TARGET LOCATION where they live.

101.    Finally, cash proceeds of the Target Offenses are likely to be found in the TARGET LOCATION.  There were 15 purchases of firearms and/or methamphetamine pills from SON and CHAN, as recently as June 27, 2023.  In the course of those deals, CI-1 and the undercover officers paid SON and CHAN a total of $16,150 OAF.  Therefore, all of that cash has been serialized and documented by investigators.  I know from my training and experience that individuals engaged in criminal activity for profit, like SON and CHAN, usually maintain the proceeds of their crimes as cash, and they store those proceeds in a secure and convenient location, typical their homes.  Here, even considering the possibility that SON and CHAN shared a portion of the OAF with their drug and firearms suppliers, it is still very likely that a search of the TARGET LOCATION will yield serialized OAF, the discovery of which would constitute evidence of the Target Offenses.

102.    There is not one but two gun and drug traffickers residing at the TARGET LOCATION.  After SON involved CHAN in the deals with CI-1 on March 29, 2023, I believe, based on their coordinated actions in that deal and subsequent deals, as described herein, that SON and CHAN were conspiring to traffic methamphetamine pills and machinegun conversion devices

in their sales to CI-1 and the FBI UC.  Accordingly, there is probable cause to believe that the TARGET LOCATION contains not just firearms and evidence of illegal firearms possession, but also evidence of ongoing drug distribution and firearms trafficking conspiracies furthered by SON and CHAN.

### *General Information Regarding Preservation and Storage of Firearms*

103.    Based upon my experience and the experience of other law enforcement officers who have participated in the execution of search warrants at the residences of firearm traffickers, I am aware that the following kinds of firearm-related evidence have typically been recovered during searches of firearm traffickers' residences:

a. Firearms, explosives, ammunitions, firearm components, firearm accessories, tactical equipment and other items pertaining to the domestic and international trafficking of firearms, including, but not limited to, handguns, pistols, revolvers, rifles, machine guns, and other weapons, and any records of receipts pertaining to firearms, parts, accessories and ammunition;

b. Any and all tools reasonably believed to be possessed or used by subject of this investigation in furtherance of manufacturing or modifying firearms; including but not limited to drills, presses, jigs, and cutting tools.

c. Records and documents showing indicia of residency;

d. Books, records, receipts, bills of lading, notes, ledgers, papers, business records, packaging, and other items relating to the purchase, possession, receipt, transfer, manufacture or distribution of firearms, including, but not limited to, materials, chemicals, tools and literature related to firearms;

e. Wireless telephones, telephone bills, telephone note pads and notes, contracts and other documents reflecting the ownership, subscription information, and the use of the telephones, reasonably believed to be possessed or used by subject of this investigation in furtherance of the Target Offenses;

f. Photographs, including still photographs, negatives, video recordings, slides, film, undeveloped film, digital photos and the contents therein, in particular, photographs of co-conspirators, or those relating to purchase, possession, receipt, transfer, manufacture or distribution of firearms;

g.  Contact information relating to suppliers, manufacturers and purchasers involved in the purchase, possession, receipt, transportation, transfer, manufacture or distribution of firearms;

h.  Correspondence pertaining to the purchase, possession, receipt, transfer, manufacture or distribution of firearms, whether transmitted or received using a computer, wireless telephone, a facility or means of interstate commerce, common carrier, or mail; and

i.  Safes or other locked containers and their contents to be searched for the listed items.

104.    Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am aware that the items listed above are durable and are generally kept at the residence of firearm manufacturers and illegal firearm dealers. Such individuals will keep firearms, firearm parts, and tools to manufacture firearms for long periods of time.  Further, such individuals keep records of their firearm dealing, such as contact information of sources/suppliers and customers in their residence.

105.    Based on my training and experience as an ATF Special Agent, I know that individuals typically possess in their residences, documents and other items that reflect their occupancy and control of the premises, such as personal mail, checkbooks, identification, notes, correspondence, leases, utility bills, rent receipts, financial documents, keys, and photographs.

### *Drug Traffickers' Use of Residences Generally*

106.    Based on my training, experience, participation in other narcotics investigations, and extensive discussions with other law enforcement officers experienced in narcotics investigations, I am aware that it is generally a common practice for drug traffickers to store drug-related paraphernalia and records in their residences for longer periods of time than they keep drugs in their residences.  I have participated in the execution of numerous search warrants of the residences of drug traffickers whose criminal activity is similar to that of SON and CHAN.  In a substantial number of residential searches executed in connection with the drug investigations in

which I have been involved, drug-related evidence has typically been recovered including cash, records, drugs, and other valuable items.  Based on this experience and my training, I believe that:

a.  Drug traffickers often find it necessary to store large sums of cash received from the sale and distribution of controlled substances outside the normal banking system.  Accordingly, narcotics traffickers frequently maintain large amounts of cash and other valuable assets at their residence in order to maintain and finance their ongoing business;

b.  Drug traffickers frequently maintain books, records, receipts, notes, ledgers, money orders, emails, and other documents relating to the ordering, sale, and distribution of controlled substances and monetary instruments and other assets, and to debts and collections relating to monies owed or due for the distribution of controlled substances.  Such documents may be maintained in paper or electronic form, and are generally maintained where the narcotics traffickers have ready access to them, including in cell phones and other electronic media capable of storing such information electronically, at locations such as their residences or other locations where they regularly conduct their drug business.  Because drug traffickers in many instances will "front" controlled substances to their clients, such record-keeping is necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand so as to readily ascertain current balances.  Often drug traffickers keep "pay and owe" records to show balances due for drugs sold in the past ("pay") and for payments expected ("owe") as to the trafficker's suppliers and the trafficker's dealers.  Additionally, drug traffickers must maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their drug trafficking business.  I am also aware that drug traffickers often maintain such documents related to their drug trafficking activities at their residences for an extended period of time, regardless of whether they are physically in possession of drugs on the premises;

c.  It is common for drug dealers to conceal records of drug transactions in secure locations within their cell phones, computers, residences, businesses, and/or other locations and devices over which they maintain dominion and control, for ready access and to conceal these items from law enforcement authorities;

d.  It is common for drug traffickers to hide controlled substances, proceeds of drug sales (e.g., large amounts of currency, financial instruments, jewelry, safety deposit keys), and records relating to controlled substances income and expenditures of money and wealth, such as money orders, wire transfers, bank statements, checkbooks, check registers, and evidence of financial transactions relating to obtaining, transferring, hiding, or spending large sums of money made from controlled substance trafficking activities in secure locations within residences, businesses, or other locations over which they maintain dominion and control, for ready access and to conceal them from law enforcement authorities;

e.  Drug traffickers commonly maintain electronic and paper books or documents which reflect names, addresses, and/or telephone numbers of their associates in the trafficking

organization, and other contact or identification data relating to the distribution of controlled substances.  Such records and items are maintained where the traffickers have ready access to them, commonly on the traffickers' cell phones or other electronic devices.  They also tend to maintain for long periods of time telephone billing records that evidence the placing of large numbers of communications each month in connection with narcotics dealing;

f.  Drug traffickers commonly have photographs of themselves, their associates, their property, and their products in their possession or in their residences, and frequently maintain these photographs on their cell phones and other electronic devices;

g.  Drug traffickers frequently maintain the items described above inside safes, key-lock strong boxes, suitcases, safe-deposit boxes and other containers, which are further secured by combination and/or key locks of various kinds in order to hide the contraband from other individuals living at or in the vicinity of their residence;

h.  Drug traffickers frequently build "stash" places within their residences or other locations in order to store illicit drugs as well as the items described above;

i.  Residents, whether drug traffickers or not, typically keep items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises.  Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys.

### *Drug Traffickers' Use of Cell Phones and Devices Generally*

107.    Based upon my knowledge, training and experience, I know that a cellular telephone is a handheld wireless device used primarily for voice communication through radio signals.  These telephones send signals through networks of transmitter/receivers called "cells," enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones now offer a broad range of capabilities.  These capabilities include but are not limited to: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and email; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on

personal calendars; and accessing and downloading information from the Internet. Wireless telephones and similar portable electronic devices may also include global positioning system technology for determining the location of the device. Based on my training and experience, I know that many cellular telephones and portable electronic devices have the capabilities described above.

108.    Based on my training and experience, I know that cellphones are ubiquitous and commonly in the physical possession or control of their owners. I also know that most drug traffickers regularly use cellphones to communicate about their drug trafficking activities with customers, suppliers, and other coconspirators, and also to ascertain drug availability and pricing. I know from training and experience that drug traffickers are often aware of law enforcement's use of electronic surveillance, and thus frequently change cellular telephone numbers and/or use multiple cellular phones at the same time, as well as prepaid cellular phones (where the subscriber of the phone is not required to provide personal identifying information), all in an effort to thwart law enforcement's use of electronic surveillance. Because cellular telephones are often a principal means of communication and are central to the negotiation and coordination of drug trafficking, drug dealers typically keep multiple cellphones in close physical proximity and in their residences. Additionally, in my experience, many drug traffickers do not discard cellphones when they are replaced or when they acquire new phone numbers, but instead keep them in their residences. As a result, it is common to recover from drug dealers' residences not only paper records pertaining to the use of cellphones by the drug dealers, such as bills, call detail records, statements, and other documents, but also the cellphones themselves. As instrumentalities of drug trafficking, the devices likely contain further evidence of violations of drug laws like the Target Offenses, as discussed herein.

109.     Seizure of devices containing this information will provide information relating to coconspirators and accomplices.  I know, based upon my training and experience, as well as consultation with other investigators, that individuals who sell controlled substances typically use cellular telephones to communicate with their suppliers, their customers, and with other coconspirators, and that they communicate both via both voice calls and via email and/or text messaging.  I also know that drug traffickers regularly keep records of their illegal activities.  These records can include, but are not limited to, contact list of buyers and sellers, ledgers of sales and money owed by customers or to suppliers, and lists of quantities and/or specific controlled substances preferred by or ordered by specific customers.  Individuals engaged in drug trafficking activities often take photographs of their closest confederates.   Records of drug trafficking activities can be produced and maintained on paper in a tangible form and/or by electronic means on a cellular telephone or electronic device.  From my training and experience, and information provided to me by other agents, I am aware that individuals commonly store records of the type described in Attachment B on their cellular telephones and portable electronic devices.

### *Seizure of Computer Equipment and Data*

110.     From my training, experience, and information provided to me by other agents, I am aware that individuals frequently use computers to create and store records of their actions by communicating about them through e-mail, instant messages, and updates to online social-networking websites, drafting letters, keeping their calendars, arranging for travel, storing pictures, researching topics of interest, buying and selling items online, and accessing their bank, financial, investment, utility and other accounts online.  I am also aware that the Consumer Electronics Association estimates in 2010, 86% of all U.S households owned at least one computer.

111.    Based on my training, experience, and information provided by other law enforcement officers, I know that many smartphones (which are included in Attachment B's definition of "Hardware") can now function essentially as small computers. Smartphones have capabilities that include serving as a wireless telephone, digital camera, portable media player, GPS navigation device, sending and receiving text messages and emails, and storing vast range and amount of electronic data. Examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

112.    In this investigation, there is probable cause to believe that SON and CHAN are using digital and electronic tools to facilitate drug and firearms trafficking, most prominently by, but not necessarily exclusively by, means of one or more smartphones.

113.    Based on my knowledge, training, experience, and information provided to me by the other agents, I know that computer files or remnants of such files can be recovered months or years after they have been written, downloaded, saved, deleted, or viewed locally or over the Internet. This is true because:

   a.   Electronic files that have been downloaded to a storage medium can be stored for years at little or no cost. Furthermore, when users replace their computers, they can easily transfer the data from their old computer to their new computer.

   b.   Even after files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might not occur for long periods of time. In addition, a computers' operating system may also keep a record of deleted data in a "swap" or "recovery" file.

   c.   Wholly apart from user-generated files, computer storage media in particular, computers' internal hard drives contain electronic evidence of how the computer has been used, what is has been used for, and who has used it. This evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. It is technically possible to delete this information, but computer users typically do not erase or delete this evidence because special software is typically required for that task.

    d.   Similarly, files that have been viewed over the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." The browser often maintains a fixed amount of hard drive space devoted to these files, and the other files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

114.    Based on my knowledge, training, and the experience of other agents with whom I have spoken, I am aware that in order to completely and accurately retrieve data maintained in computer hardware, computer software or storage media, to ensure the accuracy and completeness of such data, and to prevent the loss of the data either from accidental or programmed destruction, it is often necessary that computer hardware, computer software and storage media be seized and subsequently processed by a computer specialist in a laboratory setting rather than in the location where it is seized. This is true because of:

    a.   The volume of evidence storage media such as hard disks, flash drives CD's and DVD's can store the equivalent of thousands or in some instances, millions of pages of information. Additionally, a user may seek to conceal evidence by storing it in random order or with deceptive file names. Searching authorities may need to examine all the stored data to determine which particular files are evidence, fruits or instrumentalities of criminal activity. This process can take weeks or months, depending on the volume of data stored and it would be impractical to attempt to on-site analysis.

    b.   Technical requirements of analyzing computer hardware, computer software or storage media for criminal evidence is a highly technical process requiring expertise and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications. Thus, it is difficult to know, before the search, which expert possess sufficient specialized skill to best analyze the system and its data. Furthermore, data analysis protocols are extracting procedures, designed to protect the integrity of the evidence and to recover even "hidden," deleted, compressed or encrypted files. Many commercial computer software programs also save data in unique formats that are not conducive to standard data searches. Additionally, computer evidence is extremely vulnerable to tampering or destruction, both from external sources and destructive code imbedded in the system as a "booby trap."

    c.   Consequently, law enforcement agents may either copy the data at the premises to be searched or seize the computer equipment for subsequent processing elsewhere.

115.    The premise may contain computer equipment whose use in the crimes or storage of the things described in this warrant is impractical to determine at the scene.   Computer

equipment and data can be disguised, mislabeled, or used without the owner's knowledge. In addition, technical, time, safety, or other constraints can prevent definitive determination of their ownership at the premises during the execution of this warrant. If the things described in Attachment B are of the type that might be found on any of the computer equipment, this application seeks permission to search and seize it onsite or offsite in order to determine their true use or contents, regardless of how the contents or ownership appear or are described by the people at the scene of the search.

## CONCLUSION

116.    Based on all the foregoing, I request the issuance of a search warrant for the TARGET LOCATION based on probable cause to believe that SON and CHAN have committed violations of 18 U.S.C. § 922(a)(1)(A), unlicensed dealing in firearms; 18 U.S.C §922(o), unlawful possession or transfer of a machinegun; 18 U.S.C. § 933(a)(3), firearms trafficking conspiracy; and 21 U.S.C. § 846, drug trafficking conspiracy, and that the TARGET LOCATION, as described in Attachment A, presently contains evidence of the Target Offenses, as described in Attachment B.

Sworn under the pains and penalties of perjury,


_____
VANESSA E. FLICK
Special Agent
Bureau of Alcohol, Tobacco,
Firearms and Explosives


Attested and sworn to via telephone in accordance with Federal Rule of Criminal Procedure 4.1 on July 26, 2023.



HON. JENNIFER C. BOAL
United States Magistrate Judge
District of Massachusetts

## <u>ATTACHMENT A</u>

### <u>PLACE TO BE SEARCHED</u>

11 Greendale Ave, Lowell, Massachusetts is inside a two story, multi-family home. It is a six bedroom, three-bathroom home. The outside construction appears to be made of beige, vinyl siding and has approximately 2,700 square feet of interior space. On the road facing side of the residence, there is a small set of wooden stairs leading up to two, white entry doors, with #11 being the door to the left. The door on the right bears the number 9. There is a paved driveway to the residence offset to the right of the address. There is a short chain-link fence on the road facing side of the residence.  An image of the front of the structure, as viewed from the street, appears below.



### ATTACHMENT B

### PROPERTY TO BE SEIZED

I.   All records, in whatever form, and tangible objects, from December 1, 2022 through June 27, 2023, that constitute evidence, fruits, or instrumentalities of violations of 18 U.S.C. § 922(a)(1)(A), unlicensed dealing in firearms; 18 U.S.C §922(o), unlawful possession or transfer of a machinegun; 18 U.S.C. § 933(a)(3), firearms trafficking conspiracy; and 21 U.S.C. § 846, drug trafficking conspiracy, including:

   a.   Any and all firearm, explosive, ammunition, firearm component, firearm accessory, tactical equipment and other items pertaining to the domestic and international trafficking of firearms, including, but not limited to, handguns, pistols, revolvers, rifles, machine guns, and other weapons, and any records or receipts pertaining to firearms, parts, accessories and ammunition;

   b.   Records and documents showing indicia of residency;

   c.   Any and all tools reasonably believed to be possessed or used by subjects of this investigation in furtherance of manufacturing or modifying firearms; including but not limited to drills, presses, jigs, and cutting tools.

   d.   Any and all books, records, receipts, bills of lading, notes, ledgers, papers, business records, packaging, and other items relating to the purchase, possession, receipt, transfer, manufacture or distribution of firearms, including, but not limited to, materials, chemicals, tools and literature related to firearms;

   e.   Any and all wireless telephones, telephone bills, telephone note pads and notes, contracts and other documents reflecting the ownership, subscription information,

1

and the use of the telephones, reasonably believed to be possessed or used by Samnang SON and Billy CHAN.

f.   Any and all photographs, including still photographs, negatives, video recordings, slides, film, undeveloped film, digital photos and the contents therein, in particular, photographs of co-conspirators, or those relating to purchase, possession, receipt, transfer, manufacture or distribution of firearms;

g.   Any and all contact information relating to suppliers, manufacturers and purchasers involved in the purchase, possession, receipt, transportation, transfer, manufacture or distribution of firearms;

h.   Any and all safes or other locked containers and their contents to be searched for the listed items.

i.   Records and tangible objects pertaining to the existence, identity, and travel of any co-conspirators, as well as any co-conspirators' acts taken in furtherance of the crimes listed above.

j.   Paraphernalia for packaging, processing, diluting, weighing and distributing controlled substances, such as scales, funnels, sifters, grinders, glass panes and mirrors, razor blades, plastic bags, microwave ovens, heat-sealing devices, and dilutants such as mannitol, mannite and inositol – but not controlled substances.

k.   Books, records, receipts, notes, ledgers, letters, and other papers relating to the distribution of controlled substances, travel for the purpose of acquiring and/or distributing controlled substances, and monetary transactions involving the proceeds from the sale of controlled substances.

2

l.   Personal books, papers, and other electronic devices reflecting names, addresses, telephone numbers, and other contact or identification data relating to the distribution of controlled substances, money laundering, and the criminal use of communication facilities.

m.   Cash, currency and records relating to the generation of income from the sale of controlled substances and illegal firearms, including OAF from law enforcement operations involving Samnang SON and Billy CHAN, and the expenditure of such illicit income, including money orders, wire transfers, cashier's checks and receipts, bank statements, passbooks, checkbooks, and other registers, as well as consumer items such as electronic equipment, vehicles, jewelry, and other precious metals such as gold and silver, and precious gems such as diamonds-it should be noted that possession of the valuable items referenced in this paragraph, particularly by individuals with no substantial legitimate source of income, is evidence of drug trafficking as opposed to drug use.

n.   Documents and other records indicating travel in interstate and foreign commerce, such as maps, GPS coordinates, navigation coordinates, travel itineraries, plane tickets, boarding passes, motel and hotel receipts, passports and visas, credit card receipts and telephone bills and related communications.

o.   Any and all of the following objects, information, or data belonging to or used by Samnang SON or Billy CHAN: cellular telephones, smart phones, electronic tablet devices, and other electronic media utilized for communication, transportation, and data acquisition and retention purposes related to acquiring and distributing illegal drugs and proceeds including incoming and outgoing call and text message

3

logs, contact lists, photo and video galleries, sent and received text messages, online searches and sites viewed via internet, online or electronic communications sent and received (including email, chat and instant messages), sent and received audio files, navigation, mapping, and GPS files, telephone settings (including contact lists) text messages, and related identifying information such as telephone identification numbers, call forwarding information, messages drafted but not sent and voice messages.

p. Identification evidence and/or indicia such as cell phones with particular numbers, mail, deeds, leases, rental agreements, photographs, bills, and identification documents that tend to identify the person(s) in residence, occupancy, control, or ownership of subject premises and/or subject communication devices.